RANDALL, Circuit Judge:
The court granted rehearing en banc of this appeal to consider whether the adequate protection provisions of the Bankruptcy Code of 1978, 11 U.S.C. §§ 362(d)(1) and 361, can be construed to require a Chapter 11 debtor to provide an undersecured creditor with payments during the pendency of the automatic stay representing interest on the value of the secured creditor’s collateral or compensation for the lost opportunity of reinvesting the proceeds of such collateral. The panel opinion, 793 F.2d 1380 (5th Cir.1986), which held that the adequate protection provisions cannot be so construed, was vacated when the court decided to hear the appeal en banc.
I.
We hold today that the adequate protection provisions of the Bankruptcy Code,[1] *364 §§ 362(d)(1) and 361, do not require periodic postpetition payments for interest or lost opportunity cost to an undersecured creditor to compensate it for the delay of the Chapter 11 reorganization proceeding during the pendency of the automatic stay. The panel opinion is reinstated.

Legislative Postscript

We review briefly the legislative proceedings relevant to adequate protection that have taken place since the enactment of the Bankruptcy Code in 1978.
The Bankruptcy Code has been amended twice since its enactment. The Bankruptcy Amendments and Federal Judgeship Act of 1984 was enacted primarily to deal with the Supreme Court’s 1982 decision in Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Congressional action on the 1984 amendments was completed on June 29, 1984, and the amendments were signed into law by the President on July 10, 1984. See Pub.L. No. 98-353, 98 Stat. 333, 392 (1984). The 1984 legislation effected no changes in the adequate protection provisions of the Bankruptcy Code. Significantly, American Mariner was not decided until June 4, 1984; the vast majority of bankruptcy court decisions prior to that time, as well as the bankruptcy appellate panel decision in American Mariner — those being the decisions on the books during most of the time that Congress was considering the 1984 amendments — refused to construe the adequate protection provisions to require the payment of interest or lost opportunity costs.[2]
Commencing in 1985, several bills concerned with the family farm bankruptcy problem were filed in Congress. Proceedings on these bills culminated in the enactment of the Bankruptcy Judges, United States Trustees, and Family Farmers Bankruptcy Act of 1986, Pub.L. No. 99-554, 100 Stat. 3088 (1986) (H.R. 5316) [hereinafter cited as Family Farmers Bankruptcy Act of 1986], which was signed by the President on October 27, 1986. In the course of the hearings on family farm bankruptcies, numerous witnesses testified about the impact of the American Mariner decision on the reorganizability of farm debtors. American Mariner was resoundingly criticized by virtually all who testified. The pervasive sentiment expressed by those who addressed the various family farm bankruptcy proposals before Congress was that the American Mariner requirement of payment of interest or lost opportunity costs as a form of adequate protection to secured creditors was almost invariably fatal to the family farmer’s prospects for reorganization; it is the rare family farm debtor who can make the lost opportunity *365 cost payments required under American Mariner,[3] Additionally, the American Mariner result was criticized for diverting the debtor’s resources and attention away from the important task of plan formulation; the debtor is forced to spend his time and money in battling motions to lift the automatic stay.[4]
Several of those who addressed the family farm bankruptcy problem described the result of American Mariner as not being faithful to the legislative intent embodied *366 in the adequate protection provisions of the 1978 Bankruptcy Code. For example, an article critical of the American Mariner decision was included by Senator Grassley in the Congressional Record for October 3, 1986, the day the Senate considered the conference report on H.R. 5316. The author of that article concluded:
[Tjhis writer believes that American Mariner was incorrectly decided____ [T]he Court held that the underseeured creditor must receive the “indubitable equivalent” of its entire bargain under section 361(3), which was erroneously construed by the Court of Appeals for the Ninth Circuit to include the present value of the creditor’s state law rights to foreclose its collateral (and liquidate it) and reinvest the proceeds____
The Committee on Stays, Executory Contracts, and Property of the Estate for the National Bankruptcy Conference took issue initially with the American Mariner decision, arguing that the decision: (1) ignores the language of section 361 in general and section 361(3) in particular, which speaks of “adequate protection” of and the “indubitable equivalent” of the secured creditor’s interest in its collateral; (2) misreads the House and Senate Reports, which make no reference (as admitted by the Court) to the “secured creditor’s legal right to take possession of and sell the collateral” or its “equitable right to reinvest the proceeds of the sale,” 734 F.2d at 430-1, which were written before the indubitable equivalent language was incorporated in section 361(3)____ This committee’s recommendations are subject to further analysis before the National Bankruptcy Conference takes an official position for or against the committee’s recommendations and arguments. However, this writer believes that the arguments of the committee are correct and highlight the errors in the rationale of the American Mariner decision.[5]
132 Cong.Rec. S15090 n. 187 (daily ed. Oct. 3, 1986) (article by John C. Anderson) (emphasis in original).[6] Amendment of the *367 adequate protection provisions to alleviate the impact of the American Mariner decision and its construction of the adequate protection provisions was seen by most who testified as critical if family farm reorganizations were to have any chance of success.[7] As Senator Grassley, in concluding the hearings on the family farm bankruptcy problem, stated:
I envision changes to those terms in the code such as “adequate protection” that have been applied in a restrictive manner, making farmer reorganizations unreasonably difficult.
I believe we need to correct restrictive court interpretations in a way that frees up the use of cash collateral and helps to stave off attempts to lift the automatic stay.
Farm Family Hearings, supra, at 289.
The 1986 legislation that resulted from the congressional hearings amended the Bankruptcy Code by adding a new Chapter 12 to deal with family farm bankruptcies. In most respects, the new Chapter 12 is modeled on Chapter 13. The principal relief which it affords family farmers, who had previously been forced to seek relief under Chapter 11, is to eliminate the impact of the absolute priority rule on the family farm debtor. In many farm bankruptcies, the absolute priority rule gave the unsecured creditors the power to prevent confirmation of a plan if the debtor continued to have any equity interest in his farm. See 11 U.S.C. § 1129(b)(2)(B). Under the new Chapter 12, as under Chapter 13, the vote of unsecured creditors is not required for the confirmation of a plan of reorganization. Additionally, under the new Chapter 12, the family farmer can overcome an unsecured creditor’s objection to confirmation by demonstrating that “the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim.” Family Farmer Bankruptcy Act of 1986, § 1225(b)(1)(A) (to be codified at 11 U.S.C. § 1225(b)(1)(A)). Alternatively, the unsecured creditor’s objection can be overcome if “the plan provides that all of the debtor’s projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.” Family Farmer Bankruptcy Act of 1986, § 1225(b)(1)(B) (to be codified at 11 U.S.C. § 1225(b)(1)(B)).
The new Chapter 12 also amends the adequate protection provisions as they ap *368 ply to family farmers by making § 361 inapplicable in family farm reorganization cases brought under Chapter 12, and by setting forth, in § 1205, the forms that adequate protection can take in family farm reorganizations. Family Farmer Bankruptcy Act of 1986, § 1205 (to be codified at 11 U.S.C. § 1205).[8] Significantly, § 1205 sanctions, as a form of adequate protection, payment by the debtor for the use of farmland of “the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property.” Family Farmer Bankruptcy Act of 1986, § 1205 (to be codified at 11 U.S.C. § 1205). The expectation is that this will result in payments by the debtor to secured creditors that are significantly smaller than those that would have obtained under American Mariner. As the conference report accompanying H.R. 5316 notes:
Lost opportunity costs payments present serious barriers to farm reorganizations, because farmland values have dropped so dramatically in many sections of the country — making for many undercollaterialized [sic] secured lenders. Family farmers are usually unable to pay lost opportunity costs. Thus, family farm reorganizations are often throttled in their infancy upon motion to lift the automatic stay.
Accordingly, section 1205 of the conference report provides a separate test for adequate protection in Chapter 12 cases. It eliminates the need of the family farmer to pay lost opportunity costs, and adds another means for providing adequate protection for farmland — paying reasonable market rent. Section 1205 eliminates the “indubitable equivalent” language of 11 U.S.C. 361(3) and makes it clear that what needs to be protected is the value of property, not the value of the creditor’s “interest” in property.
It is expected that this provision will reduce unnecessary litigation during the term of the automatic stay, and will allow the family farmer to devote proper attention to plan preparation.
H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 49-50, reprinted in 1986 U.S.Code Cong. & Ad.News 5227, 5246, 5250-5251.
A few significant conclusions can be drawn from the action of Congress in 1986. The first is that virtually all witnesses testifying at the hearings, and Congress itself, recognized the disastrous impact of American Mariner on the family farmer’s reorganization prospects. The second is that Congress, although believing that some form of adequate protection of the interest of certain secured creditors (those with a security interest in farmland) was in order, chose to effectuate that adequate protection by means of an amendment to the statute that tied the protection to the use of the farmland and to comparable rental values and the net income of the debtor. *369 This gives the bankruptcy judge the flexibility to award some compensation to the secured creditor without destroying the debtor’s prospects for reorganization.
The enactment of § 1205, making § 361 inapplicable to family farm reorganization cases and providing for rental payments as adequate protection, is an example of the legislative process at work. Congress held hearings during which witnesses representing various interest groups testified. With few exceptions, those witnesses excoriated the American Mariner result. After considering the testimony, Congress made the decision legislatively to overrule American Mariner in the context before it — that of family farm bankruptcies. What resulted reflects a compromise based on the consideration of the often competing interests of the debtor, the secured creditors, and the unsecured creditors.
This history of § 1205 stands in stark contrast to the legislative history of the Bankruptcy Code. In the course of the extensive hearings leading up to the 1978 enactment, there is no evidence of the legislative process at work with respect to the problem of compensation for delay. Adequate protection payments for lost opportunity or interest were never discussed.
Doubtless the argument will be made that the enactment of § 1205, with the avowed congressional purpose of relieving the family farmer of the impact of the American Mariner decision, represents an endorsement of the American Mariner result with respect to all other debtors. For several reasons, this argument must be rejected.
To begin, § 1205 was introduced to overcome the impact on family farm debtors of the American Mariner court’s construction of the adequate protection provisions of the Bankruptcy Code. The introduction of the family farm bill hardly suggests that its sponsors viewed American Mariner as a correct interpretation of the adequate protection provisions. Cf. Russello v. United States, 464 U.S. 16, 25-26, 104 S.Ct. 296, 301-02, 78 L.Ed.2d 17 (1983) (“[T]he bills ... were introduced in order to overcome the decisions in [United States v.] Marubeni [America Corp., 611 F.2d 763], [United States v.] Meyers [432 F.Supp. 456], and [United States v.] Thevis [474 F.Supp. 134].... The introduction of these bills hardly suggests that their sponsors viewed those decisions as correct interpretations of [18 U.S.C.] § 1963(a)(1).”); United States v. Gordon, 638 F.2d 886, 888 n. 5 (5th Cir.), cert. denied, 452 U.S. 909, 101 S.Ct. 3038, 69 L.Ed.2d 411 (1981).
Additionally, the fact that Congress chose legislatively to overrule American Mariner only with respect to family farmers cannot support a construction of § 1205 as a congressional endorsement of American Mariner in other contexts. Cf. United States v. Price, 361 U.S. 304, 310, 80 S.Ct. 326, 330, 4 L.Ed.2d 334 (1960).[9] Indeed, to read the bill as an endorsement of American Mariner would stand the legislative history of the family farm bill’s adequate protection provision on its head. Too many of those who addressed the adequate protection problem in the congressional hearings assailed the American Mariner result. The fact that Congress legislatively overruled American Mariner only with respect to family farmers simply reflects the fact that Congress was responding to a specific problem—that of family farm bankruptcies—with a bill of limited scope.[10] *370 Simply stated, the 1986 enactment was farm bankruptcy legislation, not a comprehensive overhaul of the provisions of the Bankruptcy Code.
The enactment of the family farm bankruptcy legislation clearly illustrates the fact that Congress is uniquely suited to address the question of compensation for delay by Chapter 11 debtors generally. All creditors, unsecured as well as secured, are stayed from seizing the debtor’s property to satisfy their claims and are adversely affected by the delay of the reorganization process. If some or all of these creditors are to be compensated for the debtor’s use of property to which they are looking for payment or for delay, that decision (and the related decision regarding whose assets would fund that compensation) should emerge from the legislative process in which competing interests can be evaluated and compromises reached. In the meantime, it is the role of the courts to effectuate those provisions of the Bankruptcy Code that Congress has already enacted to protect creditors and to reduce delay. To those we now turn.
II.
United contends that our interpretation of the adequate protection provisions of the Bankruptcy Code effectively precludes an undersecured creditor whose collateral is not depreciating from ever obtaining relief from the automatic stay to enable it to enforce its rights in the collateral. This assertion ignores important provisions of the Bankruptcy Code which are designed to protect the secured creditor.
A fundamental purpose of the automatic stay is to “give[ ] the business a breathing spell and time to work constructively with its creditors” to propose a plan of reorganization. H.R.Rep. No. 595, 95th Cong., 2d Sess. 174, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6135 [hereinafter cited as House Report]. The continuance of the automatic stay contemplates a debtor that is reorganizable and that is actively pursuing that goal. Where there is no reasonable likelihood of reorganization or where the debtor unreasonably delays in its efforts to reorganize, the Bankruptcy Code affords several avenues for relief to all creditors, secured as well as unsecured.
Significant among those avenues for relief for the secured creditor is § 362(d)(2) which entitles a secured creditor to obtain relief from the automatic stay in order to foreclose on its collateral when “the debtor does not have an equity in such [collateral],” 11 U.S.C. § 362(d)(2)(A), and “such [collateral] is not necessary to an effective reorganization.” 11 U.S.C. § 362(d)(2)(B). Courts have consistently construed § 362(d)(2)(B) to require a showing by the debtor[11] that there is a reasonable possibility of a successful reorganization within a reasonable time.[12] The mere indispensabili *371 ty of the property to the debtor’s survival and the debtor’s hopes of reorganization are insufficient to justify continuation of the stay when reorganization is not reasonably possible.[13]
We recognize that relief from stay hearings are usually held early in the case and that they are expedited, limited in scope, and held on limited notice. Therefore, the bankruptcy court applies the “reasonable possibility of successful reorganization” standard with somewhat more indulgence than would be appropriate if the motion were made at a later stage in the proceedings or if a similar issue were raised in the context of the full-blown hearing that attends a motion to dismiss or convert the case brought under § 1112. Nonetheless, the “effective reorganization” standard must be given meaning by the bankruptcy court. To prevail against the secured creditor who has moved to lift the stay under § 362(d)(2), the debtor must do more than evince high hopes; he must be able to show a reasonable prospect for a successful reorganization within a reasonable time.[14]
Perhaps the prime avenue for relief, for both the secured and unsecured creditors of a debtor who is not reorganizable or who is unreasonably delaying, is the motion for conversion or dismissal. Section 1112(b) of the Code provides, in relevant part, that:
[O]n request of a party in interest, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause including—
(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
(2) inability to effectuate a plan;
(3) unreasonable delay by the debtor that is prejudicial to creditors;
(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;
11 U.S.C. § 1112(b). Section 1112 clearly provides the bankruptcy court with the requisite authority to terminate a Chapter 11 case based on a showing of unreasonable delay, or continuing losses coupled with the absence of a reasonable likelihood of rehabilitation, or inability to effectuate a plan of reorganization. The inquiry under *372 § 1112 is case-specific, focusing on the circumstances of each debtor. In the case of most Chapter 11 debtors, however, a plan of reorganization can be effectuated, if at all, within a matter of months, not years. An occasional Chapter 11 debtor, for example, one with a complex debt structure or multifarious business problems, may require more time. However, the existence of such a debtor is the exception, not the rule. The charge to the bankruptcy judge under § 1112, then, is to evaluate each debtor’s viability and rate of progress in light of “the best interest of creditors and the estate.”
Finally, we note that Congress, in 1978, expressly recognized the problems faced by creditors of a debtor who unreasonably delays in proposing a plan of reorganization. In § 1121 of the Bankruptcy Code, Congress gave the debtor a period of 120 days, after the commencement of the Chapter 11 case, during which the debtor has the exclusive right to file a plan of reorganization. Thereafter, if the debtor has not filed a plan, any party in interest, including any creditor, may file a plan. The 120-day period may be reduced or increased for cause, on request of a party in interest, after notice and a hearing.
The limited exclusivity period which is a feature of Chapter 11 proceedings under the Bankruptcy Code contrasts with the procedure under Chapter XI of the Bankruptcy Act which gave the debtor the exclusive right, throughout the Chapter XI proceedings, to propose a plan. The House Report accompanying H.R. 8200 noted that “[t]he exclusive right [under old Chapter XI] gives the debtor undue bargaining leverage, because by delay he can force a settlement out of otherwise unwilling creditors.” House Report, supra, at 231, U.S. Code Cong. & Admin.News 1978, p. 6191. Additionally, § 1121 represents a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor’s, have a right to a say in the future of that enterprise.[15]
While we are not called upon here to decide what factors constitute “cause” for the extension of the exclusivity period, we think that any bankruptcy court involved in an assessment of whether “cause” exists should be mindful of the legislative goal behind § 1121. The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.
Our brief review of the important creditor-protection provisions of the Bankruptcy Code demonstrates the inaccuracy of United’s assertion that our construction of the adequate protection provisions leaves the secured creditor unable to enforce its rights. Congress clearly intended to provide a wide range of remedies for the secured creditors of a debtor that does not have a reasonable possibility of reorganizing or that unreasonably delays in its efforts to reorganize. It remains for the courts to effectuate those remedies.
*373 III.
The creditor-protection provisions of the Bankruptcy Code reviewed in Part II of this opinion can be made meaningful only by bankruptcy judges who are equally sensitive to the need for creditor protection as to the need for protecting the debtor’s right to reorganize.
A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors. The secured creditor benefits from a successful reorganization because its secured claim is valued on a going-concern basis in connection with a plan of reorganization, and the secured creditor is not compelled to liquidate its collateral at forced-sale prices. However, when there is no reasonable likelihood that the statutory objective of reorganization can be realized or when the debtor unreasonably delays, then the automatic stay and other statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries. In that situation it is incumbent upon the bankruptcy judge to effectuate the provisions of the Bankruptcy Code for the protection of creditors lest the judge keep the Code’s word of promise to the ear of creditors and break it to their hope. The bankruptcy judge must meet head-on his obligation to decide, fairly and impartially, the hard questions.
Early and ongoing judicial management of Chapter 11 cases is essential if the Chapter 11 process is to survive and if the goals of reorganizability on the one hand, and creditor protection, on the other, are to be achieved. In almost all cases the key to avoiding excessive administrative costs, which are borne by the unsecured creditors, as well as excessive interest expense, which is borne by all creditors,[16] is early and stringent judicial management of the case.[17] We recognize that Congress, in 1978, amended the bankruptcy laws with the intention of removing bankruptcy judges from the administration of the debt- or’s estate.[18] The purpose of this amendment was to insure the impartiality of the bankruptcy judge. We do not believe, however, that Congress thereby intended to relieve the bankruptcy judge of the responsibility of managing the cases before him in such a way as to promote the objectives and goals of the Bankruptcy Code. Our conclusion in this respect is strengthened by the fact that the bankruptcy court is an *374 adjunct of the district court. District court judges function under Fed.R.Civ.P. 16 with full power and responsibility to manage their cases and with the directive to move their cases in such a way as to promote fairness to the parties and judicial economy. These responsibilities are not incompatible with their judicial function; indeed, they are at the core of it. We recognize that the line between administration of the debtor’s estate that would jeopardize the bankruptcy judge’s impartiality and effective case management may sometimes be a difficult one to draw. Nevertheless, we think that each bankruptcy judge is called upon to manage the cases in front of him, fairly and impartially, in such a way as to promote their orderly and prompt disposition. The difficulty in ascertaining where the line is to be drawn cannot be an excuse for a judge’s abdication of his responsibility to function as a judge.
IV.
The district court’s order is reversed to the extent that it ordered Timbers to pay $42,500 monthly for “adequate protection of foreclosure rights.” This matter is remanded to the district court for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.

. Terms defined in the panel opinion are used herein as therein defined.

. In 1981, the House Subcommittee on Courts, Committee on the Judiciary, held hearings on the effect of the Bankruptcy Reform Act of 1978. These hearings, which are included in the legislative history of Pub.L.No. 98-353, were in the nature of oversight; they did not concern any particular pending legislation. The automatic stay was discussed only twice in the course of those proceedings. Richard Levin, an attorney on the staff of the House Judiciary Committee, stated:
[T]he new automatic stay of § 362 and the provisions for relief from the stay appear to be working well. The compromises that were forged in that area after extensive discussion and debate seem to protect the interests involved, by insuring reasonably expeditious and fair resolution of automatic stay disputes.
Hearings on The Bankruptcy Reform Act of 1978 Before the Subcomm. on Courts of the Senate Comm, on the Judiciary, 97th Cong., 1st Sess. 312 (1981). Another witness, Lloyd D. George, Bankruptcy Judge for the District of Nevada, stated that "[t]he standards for granting relief from the automatic stay provisions of 11 U.S.C. 362, the times for filing plans, and even the types of procedures available to particular creditors are much clearer under the new code." Id. at 206. He continued by observing that most of those whose interests lay on the side of the creditor "thought that the drafters of the code had struck a reasonable balance between the conflicting interests of debtors and their creditors.” Id. at 207.
These statements were made in April 1981, at a time when no court had espoused, in a published opinion, the position adopted three years later by the Ninth Circuit in American Mariner. No proposed amendments to §§ 361 or 362(d) arose out of these hearings.

. In November 1985, the Subcommittees on Administrative Practice and Procedure, and Courts, Senate Committee on the Judiciary, held hearings on the family farm bankruptcy problem. In his comments to the subcommittees regarding various proposals before the Senate, Richard F. Stageman, Bankruptcy Judge for the Southern District of Iowa, observed that:
[A] farmer is forced to compensate creditors for the delay in the enforcement of their rights caused by the Chapter 11 created "breathing space”. In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984). The Eighth Circuit has adopted this burdensome concept in In re Martin, 761 F.2d 472 (8th Cir.1985)....
Unfortunately, the vast majority of farm debtors are unable to provide creditors with adequate protection under the Martin analysis. Judge Fagg speaking for the Martin court states that "the concerns we express are not insurmountable” to which I as a work-a-day bankruptcy judge would offer — neither is Mount Everest.
The Question of the Remedies Available to Debtors and Creditors under Bankruptcy, How they Relate to the Great Plight of the American Farm and the Farm Family: Hearings Before the Subcomms. on Admin. Practice and Procedure, and Courts of the Senate Comm, on the Judiciary, 99th Cong., 1st Sess. 51-52 (1985) [Hereinafter cited as Farm Family Hearings ]. In his prepared statement to the subcommittees, Judge Thomas M. Moore, Bankruptcy Judge in the Eastern District of North Carolina, echoed this sentiment:
At least two Circuit Courts of Appeal have held that “adequate protection” requires the debtor to compensate the secured creditor for "lost opportunity costs” in those cases where the value of the collateral is less than the amount of debt secured by the collateral. In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984): Grundy National Bank v. Tandem Mining Corporation, 754 F.2d 1436 (4th Cir.1985)....
Our district is in the Fourth Circuit and payment for "lost opportunity costs” is required for adequate protection where the value of the collateral is less than the amount of the secured debt owed the creditor. However, the farmers in our district are unable to pay "lost opportunity costs.” In fact, most of them are unable to pay an attorney a reasonable retainer for filing the petition. This requirement for the payment of "lost opportunity costs" is the first and one of the biggest obstacles faced by the farmer-debtor. Unless the requirement for payment of “lost opportunity costs” is modified, the farmer in our district will not have the time to formulate and file a plan of reorganization.
Id. at 177-78.
Bankruptcy attorney R. Fred Dumbaugh commented to the subcommittees that
[t]he Farmer-Debtor’s case can ... be ‘won or lost’ at a very early stage in the reorganization efforts, depending upon the outcome of stay litigation. Given the recent trend in case law interpretation of the requirements of adequate protection, the risk to the Farmer-Debt- or increases each day. See, In Re American Mariner Industries, 734 F.2d 426 (9th Cir.1984).
Id. at 117. William L. Needier, another bankruptcy attorney, suggested that "Congress should specifically overrule the American Mariner case and Lend Lease v. Briggs Transportation Co., Civ. 3-84-224 (D.Minn. Sept. 26, 1984), both of which set impossible guidelines for adequate protection in reorganization proceedings.” Id. at 267-68.

. A bankruptcy practitioner described the situation as follows:
[A] great deal of the time and resources of the Farmer-Debtor are spent in negotiations and litigation involving stay motions. By a large margin, stay motions consume more time and resources of the Debtor than any other aspect of the case____ In many cases, a motion for relief from the automatic stay is a “knee-jerk” reaction to the filing of the Bankruptcy Petition. Many creditors see stay motions as a way to defeat the reorganization effort at an early stage, or to demand a "larger chunk of the pie” than they might otherwise get had no stay motion been filed.
The reason why the Farmer-Debtor must spend so much time and resources in combat-ting stay litigation is that there is so much "at risk” for the Farmer-Debtor should the movant prevail in having the automatic stay terminated____ Given the recent trend in case law interpretation of the requirements of adequate protection, the risk to the Farmer-Debt- or increases each day. See, In re American Mariner Industries, 734 F.2d 426 (9th Cir.1984).
Farm Family Hearings, supra, at 116-17 (statement of R. Fred Dumbaugh).

. Additionally, the author noted that the Committee felt that the American Mariner decision
(3) erroneously equates "indubitable equivalent" of the secured creditor’s interest in the collateral in section 361(3) to "indubitable equivalent" of the secured claim in section 1129(b)(2)(A)(iii), where the latter phrase appears as an alternative to the discounted present value "as of the effective date of the plan” of deferred cash payments under the plan; (4) ignores the statutory scheme, which is that adequate protection under section 361 [with the back-up of super priority under section 507(b) ] was designed to preserve only the value of the secured creditor’s interest in the collateral in order to fix the amount of the secured claim, which must then be fully compensated by present value under the plan, whether the plan is confirmed under section 1129(a)(7) or under section 1129(b)(2)(A); (5) allows an undersecured creditor to obtain, early in the proceeding, the full value of its claim on the encumbered collateral, although the value of the unsecured creditors’ claims on unencumbered collateral remains at risk throughout the case; and, at the same time, gives the undersecured creditor postpetition interest on the secured part of its claim by way of adequate protection, although section 506(b) does not allow any postpetition interest as part of the secured portion of the undersecured claim; (6) will jeopardize many reorganizations by enabling secured creditors to obtain, early in the Chapter 11 case, the full value of their claims, whereas the statutory scheme requires that they receive that value only on confirmation of a plan.
132 Cong.Rec. S15090 n. 187 (daily ed. Oct. 3, 1986) (article by John C. Anderson) (emphasis in original).

. In the same article, the author described the "growing trend of cases interpreting the legislative history of the Code to require a more stringent standard of indubitable equivalence than this writer believes is consistent with the spirit of reorganization concepts,” and cited American Mariner as an example. 132 Cong.Rec. S15085 (daily ed. Oct. 3, 1986) (article by John C. Anderson).
During the hearings before the Subcommittees on Administrative Practice and Procedure, and Courts, Senate Committee on the Judiciary, one witness noted that:
Recently, adequate protection has also been interpreted to require payments to secured creditors based upon opportunity cost. See, In Re American Mariner, 734 F.2d 426 (9th Cir.1984)....
... However, interest payments to an undersecured creditor seems inconsistent with § 506(b) of the Code, which provides for the accrual of post-petition interest only if the collateral is worth more than the debt.
Some courts have seen this apparent inconsistency as sufficient grounds for refusing to *367 order adequate protection payments for opportunity cost. See, In Re South Village, Inc., 25 B.R. 987 (1982)....
The reports accompanying the Bankruptcy Code support the South Village result. H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977) , U.S.Code Cong. & Admin.News, P. 6295; S.Rep. 95-989, 95th Cong., 2nd Sess. 54 (1978), U.S.Code Cong. & Admin.News, P. 5840. These reports indicate Congress had in mind the protection of loss in value of the collateral due to depreciation in that value. Perhaps Congress should now make that intention explicit by amending § 361 to § 363 to exclude adequate protection for opportunity cost.
Farm Family Hearings, supra, at 250-51 (statement of Terry M. Anderson).

. In a statement submitted at the hearings on the family farm bankruptcy problem, one witness urged that “[t]he provisions of section 361 ... be amended to clarify the adequate protection definition,” Farm Family Hearings, supra, at 266 (statement of William L. Needier), and went on to suggest that ”[t]he Code should ... be changed to make it clear that the decision of the 9th Circuit Court of Appeals in American Mariner, 734 F.2d 426, 1984 is abolished." Id. at 267. Echoing this sentiment, another witness suggested that ”[p]erhaps Congress should now make [its] intention [to protect the loss in value of the collateral due to depreciation in that value] explicit by amending § 361 to § 363 to exclude adequate protection for opportunity cost.” Id. at 251 (statement of Terry Anderson).
As might be expected, a representative of the Independent Bankers Association of America stated:
[W]e support the American Mariner decision since it strikes an appropriate balance between the right of a debtor to secure a “breathing space” from his creditors through the automatic stay and the right of a creditor to receive compensation for being unable to demand prompt payment or to foreclose and take possession of the collateral. Congress does not need to take further action on this issue.
Id. at 156 (statement of John C. Dean).

. Section 1205 provides:
“(a) Section 361 does not apply in a case under this chapter.
“(b) In a case under this chapter, when adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
"(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of property securing a claim or of an entity’s ownership interest in property;
"(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of property securing a claim or of an entity’s ownership interest in property;
“(3) paying to such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property; or
“(4) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will adequately protect the value of property securing a claim or of such entity’s ownership interest in property.
Family Farmer Bankruptcy Act of 1986, § 1205 (to be codified at 11 U.S.C. § 1205).

. In Price, the Supreme Court considered whether a subsequent legislative development changed its view of § 272(a)(1) of the Internal Revenue Code. The subsequent legislative development at issue was the failure of Congress to adopt a House subcommittee recommendation to expressly repudiate certain court decisions. The Supreme Court stated that “[t]his recommendation was not adopted, and from the failure to act, respondent would have us infer an acceptance by Congress of the Ninth Circuit’s position. Such nonaction by Congress affords a most dubious foundation for drawing positive inferences.” 361 U.S. at 310-11, 80 S.Ct. at 330.

. Throughout the proceedings during which various family farm bankruptcy proposals were considered, the emergency nature of the problem and the limited scope of the proposed solutions were recognized. See, e.g., Farm Family Hearings, supra, at 2 (statement of Sen. John P. East) (“The problem we are confronted with today is a depression on the American farm. I *370 do not think it is an exaggeration to say a depression. We are trying to be responsive to that compelling need____ What we hope to do here this morning is to begin a modest venture of seeking possible avenues to relieve this financial burden on the family farm.”); Id. at 27 (statement of Rep. Mike Synar) (“It is critical that the problems of the Bankruptcy Code be worked out soon because, as we all know, the farm crisis is getting worse____ [The bill] does not attempt to overhaul the Bankruptcy Code or alter existing policies.”); Id. at 59 (statement of Richard Stageman) ("[T]hese amendments ... designed to treat a special group in a unique situation____”); 132 Cong.Rec. S15075 (daily ed. Oct. 3, 1986) (statement of Sen. Thurmond) ("The family farm provisions of [H.R. 5316] are an extraordinary response to what is, hopefully, a temporary crisis."); 132 Cong.Rec. H9001 (daily ed. Oct. 2, 1986) (statement of Rep. Fish) ("A new chapter 12 for family farmers, patterned in a number of respects after existing chapter 13, is tailored specifically to the realities of a nationwide farm crisis.”).

. Under 11 U.S.C. § 362(g), the secured creditor has the burden of proof on the issue of the debtor’s equity in the property and the debtor has the burden of proof on all other issues.

. See, e.g., In re Pacific Tuna Corp., 48 B.R. 74, 78 (Bankr.W.D.Tex.1985) ("reasonable possibility of a successful reorganization of the debtor within a reasonable time"); In re Development, Inc., 36 B.R. 998, 1005 (Bankr.D.Haw.1984) ("reasonable likelihood of a successful reorganization within a reasonable period of time”); In re Martin, 19 B.R. 496, 498 (Bankr.E.D.Pa.1982) *371 ("reasonable probability that [debtor] will be able to propose a plan that will result in a successful reorganization”); In re Dublin Properties, 12 B.R. 77, 81 (Bankr.E.D.Pa. 1981) ("reasonable probability that [debtor] will be able to propose a plan that will result in its successful reorganization”); In re Accent Assocs., Inc., 8 B.R. 933, 936 (Bankr.D.Mass.1981) ("reasonable possibility of an effective reorganization within a reasonable time”) (emphasis in original); In re Terra Mar Assocs., 3 B.R. 462, 466 (Bankr.D. Conn. 1980) ("reasonable possibility of a successful reorganization within a reasonable time”).

. See, e.g., In re Albany Partners, Ltd., 749 F.2d 670, 673 n. 7 (11th Cir.1984) ("[I]t must be demonstrated that an effective reorganization is realistically possible; the mere fact that the property is indispensible to the debtor's survival is insufficient."); In re Mikole Developers, Inc., 14 B.R. 524, 527 (Bankr.E.D.Pa.1981) ("debtor’s high hopes for reorganization or need alone for the property is not the sine qua non under Section 362(d)(2)”); In re Dublin Properties, 12 B.R. at 81 ("more than a mere financial pipe dream”); In re Clark Tech. Assocs., Ltd., 9 B.R. 738, 740 (Bankr.D.Conn.1981) ("If all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that a reorganization in the near future is likely, it cannot be said that the property is necessary to an ‘effective’ reorganization.”); In re Terra Mar Assocs., 3 B.R. at 466 (“ ‘Indispensability of the property to the debtor’s survival and hope of rehabilitation is not enough ... to justify continuation of the stay when rehabilitation is hopeless....’”); see also Grundy Nat. Bank v. Tandem Mining Corp., 754 F.2d 1436, 1440 (4th Cir.1985) ("§ 362(d)(2)(B) presupposes that the property must be necessary to an ‘effective’ reorganization if relief from the stay is to be properly denied.”) (emphasis in original).

. Because a plan of reorganization under Chapter 11 can, at least since 1978, consist of a liquidation of the debtor, there may be circumstances under which the debtor is able to satisfy the "effective reorganization” test of § 362(d)(2) by showing that the property at issue is necessary to an effective liquidation of the debtor under Chapter 11, as distinguished from an effective rehabilitation of the debtor. See generally In re Koopmans, 22 B.R. 395 (Bankr.D.Utah 1982).

. In explaining the purpose and function of what is now § 1121, the House Report notes:
Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor’s, to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days. In most cases, 120 days will give the debtor adequate time to negotiate a settlement, without unduly delaying creditors. The court is given the power. though, to increase or reduce the 120-day period depending on the circumstances of the case. For example, if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement. If, on the other hand, a debtor delayed in arriving at an agreement, the court could shorten the period and permit creditors to formulate and propose a reorganization plan. Again, the bill allows the flexibility for individual cases that is unavailable today.
House Report, supra, at 231-32, U.S.Code Cong. & Admin.News 1978, pp. 6191, 6192 (footnotes omitted).

. Interest payable to the oversecured creditor is discussed in the panel opinion, 793 F.2d at 1386.

. Statistics compiled by the Administrative Office of United States Courts reflect that on a nationwide basis, only thirteen percent of the Chapter 11 cases terminated in 1985 were fully administered under Chapter 11, as distinguished from being dismissed or otherwise disposed of; in the Fifth Circuit in 1985, only five percent were fully administered. These statistics make it amply clear that in the vast majority of Chapter 11 cases, the statutory objective of reorganization cannot be realized. The challenge to the bankruptcy courts is to recognize these cases as promptly as possible and thereby to limit the administrative expense and other costs (including interest expense) borne by creditors.

. Congress intended, through its enactment of the 1978 Bankruptcy Code, to "separat[e] ... the administrative and judicial functions of the bankruptcy judge,” so that the bankruptcy courts could "become fair and unbiased fora.” House Report, supra, at 49, U.S.Code Cong. & Admin.News 1978, p. 6010. "[T]he bankruptcy judge [would] no longer be the chief executive officer of the bankrupt debtor but rather [would] be restricted to the resolution of disputes in an adversary context.” Klee, The New Bankruptcy Act of 1978, 64 A.B.A.J. 1865, 1867 (1978). “The court’s role should be limited to a judicial one, that is, dispute resolving, and it should play no administrative part in the continued operations of the debtor.” King, Chapter 11 of the 1978 Bankruptcy Code, 53 Am.Bankr.L.0J. 107, 112 (1979). The House Report accompanying H.R. 8200 quoted the recommendation of the Commission on the Bankruptcy Laws of the United States '“that the bankruptcy judges be removed from the administration of bankrupt estates and be restricted to the performance of essentially judicial functions, that is, primarily to the resolution of disputes or issues involving adversary parties and matters appropriate for judicial determination.’" House Report, supra, at 50-51, U.S.Code Cong. & Admin.News 1978, pp. 6011, 6012.