808 F.2d 363
 55 USLW 2425, 16 Collier Bankr.Cas.2d 1,
15 Bankr.Ct.Dec. 494,
Bankr. L. Rep. P 71,584
 In re TIMBERS OF INWOOD FOREST ASSOCIATES, LTD., Debtor.
UNITED SAVINGS ASSOCIATION OF TEXAS, Movant-Appellee Cross-Appellant,
v.
TIMBERS OF INWOOD FOREST ASSOCIATES, LTD.,
Respondent-Appellant Cross-Appellee.
 No. 85-2678.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 9, 1987.
 
 Leonard H. Simon, Daphne L. Levey, Timothy J. Henderson, Houston, Tex., for respondent-appellant cross-appellee.
 Thomas H. Jackson, Cambridge, Mass., amicus curiae.
 H. Miles Cohn, Houston, Tex., for movant-appellee cross-appellant.
 Appeals from the United States District Court for the Southern District of Texas.
 Before CLARK, Chief Judge, GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 The court granted rehearing en banc of this appeal to consider whether the adequate protection provisions of the Bankruptcy Code of 1978, 11 U.S.C. Secs. 362(d)(1) and 361, can be construed to require a Chapter 11 debtor to provide an undersecured creditor with payments during the pendency of the automatic stay representing interest on the value of the secured creditor's collateral or compensation for the lost opportunity of reinvesting the proceeds of such collateral. The panel opinion, 793 F.2d 1380 (5th Cir.1986), which held that the adequate protection provisions cannot be so construed, was vacated when the court decided to hear the appeal en banc.
 
 I.
 
 2
 We hold today that the adequate protection provisions of the Bankruptcy Code,[1] Secs. 362(d)(1) and 361, do not require periodic postpetition payments for interest or lost opportunity cost to an undersecured creditor to compensate it for the delay of the Chapter 11 reorganization proceeding during the pendency of the automatic stay. The panel opinion is reinstated.
 
 Legislative Postscript
 
 3
 We review briefly the legislative proceedings relevant to adequate protection that have taken place since the enactment of the Bankruptcy Code in 1978.
 
 
 4
 The Bankruptcy Code has been amended twice since its enactment. The Bankruptcy Amendments and Federal Judgeship Act of 1984 was enacted primarily to deal with the Supreme Court's 1982 decision in Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Congressional action on the 1984 amendments was completed on June 29, 1984, and the amendments were signed into law by the President on July 10, 1984. See Pub.L. No. 98-353, 98 Stat. 333, 392 (1984). The 1984 legislation effected no changes in the adequate protection provisions of the Bankruptcy Code. Significantly, American Mariner was not decided until June 4, 1984; the vast majority of bankruptcy court decisions prior to that time, as well as the bankruptcy appellate panel decision in American Mariner--those being the decisions on the books during most of the time that Congress was considering the 1984 amendments--refused to construe the adequate protection provisions to require the payment of interest or lost opportunity costs.[2]
 
 
 5
 Commencing in 1985, several bills concerned with the family farm bankruptcy problem were filed in Congress. Proceedings on these bills culminated in the enactment of the Bankruptcy Judges, United States Trustees, and Family Farmers Bankruptcy Act of 1986, Pub.L. No. 99-554, 100 Stat. 3088 (1986) (H.R. 5316) [hereinafter cited as Family Farmers Bankruptcy Act of 1986], which was signed by the President on October 27, 1986. In the course of the hearings on family farm bankruptcies, numerous witnesses testified about the impact of the American Mariner decision on the reorganizability of farm debtors. American Mariner was resoundingly criticized by virtually all who testified. The pervasive sentiment expressed by those who addressed the various family farm bankruptcy proposals before Congress was that the American Mariner requirement of payment of interest or lost opportunity costs as a form of adequate protection to secured creditors was almost invariably fatal to the family farmer's prospects for reorganization; it is the rare family farm debtor who can make the lost opportunity cost payments required under American Mariner.[3] Additionally, the American Mariner result was criticized for diverting the debtor's resources and attention away from the important task of plan formulation; the debtor is forced to spend his time and money in battling motions to lift the automatic stay.[4]
 
 
 6
 Several of those who addressed the family farm bankruptcy problem described the result of American Mariner as not being faithful to the legislative intent embodied in the adequate protection provisions of the 1978 Bankruptcy Code. For example, an article critical of the American Mariner decision was included by Senator Grassley in the Congressional Record for October 3, 1986, the day the Senate considered the conference report on H.R. 5316. The author of that article concluded:
 
 
 7
 [T]his writer believes that American Mariner was incorrectly decided.... [T]he Court held that the undersecured creditor must receive the "indubitable equivalent" of its entire bargain under section 361(3), which was erroneously construed by the Court of Appeals for the Ninth Circuit to include the present value of the creditor's state law rights to foreclose its collateral (and liquidate it) and reinvest the proceeds....
 
 
 8
 The Committee on Stays, Executory Contracts, and Property of the Estate for the National Bankruptcy Conference took issue initially with the American Mariner decision, arguing that the decision: (1) ignores the language of section 361 in general and section 361(3) in particular, which speaks of "adequate protection" of and the "indubitable equivalent" of the secured creditor's interest in its collateral; (2) misreads the House and Senate Reports, which make no reference (as admitted by the Court) to the "secured creditor's legal right to take possession of and sell the collateral" or its "equitable right to reinvest the proceeds of the sale," 734 F.2d at 430-1, which were written before the indubitable equivalent language was incorporated in section 361(3).... This committee's recommendations are subject to further analysis before the National Bankruptcy Conference takes an official position for or against the committee's recommendations and arguments. However, this writer believes that the arguments of the committee are correct and highlight the errors in the rationale of the American Mariner decision.[5]
 
 
 9
 132 Cong.Rec. S15090 n. 187 (daily ed. Oct. 3, 1986) (article by John C. Anderson) (emphasis in original).[6] Amendment of the adequate protection provisions to alleviate the impact of the American Mariner decision and its construction of the adequate protection provisions was seen by most who testified as critical if family farm reorganizations were to have any chance of success.[7] As Senator Grassley, in concluding the hearings on the family farm bankruptcy problem, stated:
 
 
 10
 I envision changes to those terms in the code such as "adequate protection" that have been applied in a restrictive manner, making farmer reorganizations unreasonably difficult.
 
 
 11
 I believe we need to correct restrictive court interpretations in a way that frees up the use of cash collateral and helps to stave off attempts to lift the automatic stay.
 
 
 12
 Farm Family Hearings, supra, at 289.
 
 
 13
 The 1986 legislation that resulted from the congressional hearings amended the Bankruptcy Code by adding a new Chapter 12 to deal with family farm bankruptcies. In most respects, the new Chapter 12 is modeled on Chapter 13. The principal relief which it affords family farmers, who had previously been forced to seek relief under Chapter 11, is to eliminate the impact of the absolute priority rule on the family farm debtor. In many farm bankruptcies, the absolute priority rule gave the unsecured creditors the power to prevent confirmation of a plan if the debtor continued to have any equity interest in his farm. See 11 U.S.C. Sec. 1129(b)(2)(B). Under the new Chapter 12, as under Chapter 13, the vote of unsecured creditors is not required for the confirmation of a plan of reorganization. Additionally, under the new Chapter 12, the family farmer can overcome an unsecured creditor's objection to confirmation by demonstrating that "the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim." Family Farmer Bankruptcy Act of 1986, Sec. 1225(b)(1)(A) (to be codified at 11 U.S.C. Sec. 1225(b)(1)(A)). Alternatively, the unsecured creditor's objection can be overcome if "the plan provides that all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." Family Farmer Bankruptcy Act of 1986, Sec. 1225(b)(1)(B) (to be codified at 11 U.S.C. Sec. 1225(b)(1)(B)).
 
 
 14
 The new Chapter 12 also amends the adequate protection provisions as they apply to family farmers by making Sec. 361 inapplicable in family farm reorganization cases brought under Chapter 12, and by setting forth, in Sec. 1205, the forms that adequate protection can take in family farm reorganizations. Family Farmer Bankruptcy Act of 1986, Sec. 1205 (to be codified at 11 U.S.C. Sec. 1205).[8] Significantly, Sec. 1205 sanctions, as a form of adequate protection, payment by the debtor for the use of farmland of "the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property." Family Farmer Bankruptcy Act of 1986, Sec. 1205 (to be codified at 11 U.S.C. Sec. 1205). The expectation is that this will result in payments by the debtor to secured creditors that are significantly smaller than those that would have obtained under American Mariner. As the conference report accompanying H.R. 5316 notes:
 
 
 15
 Lost opportunity costs payments present serious barriers to farm reorganizations, because farmland values have dropped so dramatically in many sections of the country--making for many undercollaterialized [sic] secured lenders. Family farmers are usually unable to pay lost opportunity costs. Thus, family farm reorganizations are often throttled in their infancy upon motion to lift the automatic stay.
 
 
 16
 Accordingly, section 1205 of the conference report provides a separate test for adequate protection in Chapter 12 cases. It eliminates the need of the family farmer to pay lost opportunity costs, and adds another means for providing adequate protection for farmland--paying reasonable market rent. Section 1205 eliminates the "indubitable equivalent" language of 11 U.S.C. 361(3) and makes it clear that what needs to be protected is the value of property, not the value of the creditor's "interest" in property.
 
 
 17
 It is expected that this provision will reduce unnecessary litigation during the term of the automatic stay, and will allow the family farmer to devote proper attention to plan preparation.
 
 
 18
 H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 49-50, reprinted in 1986 U.S.Code Cong. & Ad.News 5227, 5246, 5250-5251.
 
 
 19
 A few significant conclusions can be drawn from the action of Congress in 1986. The first is that virtually all witnesses testifying at the hearings, and Congress itself, recognized the disastrous impact of American Mariner on the family farmer's reorganization prospects. The second is that Congress, although believing that some form of adequate protection of the interest of certain secured creditors (those with a security interest in farmland) was in order, chose to effectuate that adequate protection by means of an amendment to the statute that tied the protection to the use of the farmland and to comparable rental values and the net income of the debtor. This gives the bankruptcy judge the flexibility to award some compensation to the secured creditor without destroying the debtor's prospects for reorganization.
 
 
 20
 The enactment of Sec. 1205, making Sec. 361 inapplicable to family farm reorganization cases and providing for rental payments as adequate protection, is an example of the legislative process at work. Congress held hearings during which witnesses representing various interest groups testified. With few exceptions, those witnesses excoriated the American Mariner result. After considering the testimony, Congress made the decision legislatively to overrule American Mariner in the context before it--that of family farm bankruptcies. What resulted reflects a compromise based on the consideration of the often competing interests of the debtor, the secured creditors, and the unsecured creditors.
 
 
 21
 This history of Sec. 1205 stands in stark contrast to the legislative history of the Bankruptcy Code. In the course of the extensive hearings leading up to the 1978 enactment, there is no evidence of the legislative process at work with respect to the problem of compensation for delay. Adequate protection payments for lost opportunity or interest were never discussed.
 
 
 22
 Doubtless the argument will be made that the enactment of Sec. 1205, with the avowed congressional purpose of relieving the family farmer of the impact of the American Mariner decision, represents an endorsement of the American Mariner result with respect to all other debtors. For several reasons, this argument must be rejected.
 
 
 23
 To begin, Sec. 1205 was introduced to overcome the impact on family farm debtors of the American Mariner court's construction of the adequate protection provisions of the Bankruptcy Code. The introduction of the family farm bill hardly suggests that its sponsors viewed American Mariner as a correct interpretation of the adequate protection provisions. Cf. Russello v. United States, 464 U.S. 16, 25-26, 104 S.Ct. 296, 301-02, 78 L.Ed.2d 17 (1983) ("[T]he bills ... were introduced in order to overcome the decisions in [United States v.] Marubeni [America Corp., 611 F.2d 763], [United States v.] Meyers [432 F.Supp. 456], and [United States v.] Thevis [474 F.Supp. 134].... The introduction of these bills hardly suggests that their sponsors viewed those decisions as correct interpretations of [18 U.S.C.] Sec. 1963(a)(1)."); United States v. Gordon, 638 F.2d 886, 888 n. 5 (5th Cir.), cert. denied, 452 U.S. 909, 101 S.Ct. 3038, 69 L.Ed.2d 411 (1981).
 
 
 24
 Additionally, the fact that Congress chose legislatively to overrule American Mariner only with respect to family farmers cannot support a construction of Sec. 1205 as a congressional endorsement of American Mariner in other contexts. Cf. United States v. Price, 361 U.S. 304, 310, 80 S.Ct. 326, 330, 4 L.Ed.2d 334 (1960).[9] Indeed, to read the bill as an endorsement of American Mariner would stand the legislative history of the family farm bill's adequate protection provision on its head. Too many of those who addressed the adequate protection problem in the congressional hearings assailed the American Mariner result. The fact that Congress legislatively overruled American Mariner only with respect to family farmers simply reflects the fact that Congress was responding to a specific problem--that of family farm bankruptcies--with a bill of limited scope.[10] Simply stated, the 1986 enactment was farm bankruptcy legislation, not a comprehensive overhaul of the provisions of the Bankruptcy Code.
 
 
 25
 The enactment of the family farm bankruptcy legislation clearly illustrates the fact that Congress is uniquely suited to address the question of compensation for delay by Chapter 11 debtors generally. All creditors, unsecured as well as secured, are stayed from seizing the debtor's property to satisfy their claims and are adversely affected by the delay of the reorganization process. If some or all of these creditors are to be compensated for the debtor's use of property to which they are looking for payment or for delay, that decision (and the related decision regarding whose assets would fund that compensation) should emerge from the legislative process in which competing interests can be evaluated and compromises reached. In the meantime, it is the role of the courts to effectuate those provisions of the Bankruptcy Code that Congress has already enacted to protect creditors and to reduce delay. To those we now turn.
 
 II.
 
 26
 United contends that our interpretation of the adequate protection provisions of the Bankruptcy Code effectively precludes an undersecured creditor whose collateral is not depreciating from ever obtaining relief from the automatic stay to enable it to enforce its rights in the collateral. This assertion ignores important provisions of the Bankruptcy Code which are designed to protect the secured creditor.
 
 
 27
 A fundamental purpose of the automatic stay is to "give[ ] the business a breathing spell and time to work constructively with its creditors" to propose a plan of reorganization. H.R.Rep. No. 595, 95th Cong., 2d Sess. 174, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6135 [hereinafter cited as House Report]. The continuance of the automatic stay contemplates a debtor that is reorganizable and that is actively pursuing that goal. Where there is no reasonable likelihood of reorganization or where the debtor unreasonably delays in its efforts to reorganize, the Bankruptcy Code affords several avenues for relief to all creditors, secured as well as unsecured.
 
 
 28
 Significant among those avenues for relief for the secured creditor is Sec. 362(d)(2) which entitles a secured creditor to obtain relief from the automatic stay in order to foreclose on its collateral when "the debtor does not have an equity in such [collateral]," 11 U.S.C. Sec. 362(d)(2)(A), and "such [collateral] is not necessary to an effective reorganization." 11 U.S.C. Sec. 362(d)(2)(B). Courts have consistently construed Sec. 362(d)(2)(B) to require a showing by the debtor[11] that there is a reasonable possibility of a successful reorganization within a reasonable time.[12] The mere indispensability of the property to the debtor's survival and the debtor's hopes of reorganization are insufficient to justify continuation of the stay when reorganization is not reasonably possible.[13]
 
 
 29
 We recognize that relief from stay hearings are usually held early in the case and that they are expedited, limited in scope, and held on limited notice. Therefore, the bankruptcy court applies the "reasonable possibility of successful reorganization" standard with somewhat more indulgence than would be appropriate if the motion were made at a later stage in the proceedings or if a similar issue were raised in the context of the full-blown hearing that attends a motion to dismiss or convert the case brought under Sec. 1112. Nonetheless, the "effective reorganization" standard must be given meaning by the bankruptcy court. To prevail against the secured creditor who has moved to lift the stay under Sec. 362(d)(2), the debtor must do more than evince high hopes; he must be able to show a reasonable prospect for a successful reorganization within a reasonable time.[14]
 
 
 30
 Perhaps the prime avenue for relief, for both the secured and unsecured creditors of a debtor who is not reorganizable or who is unreasonably delaying, is the motion for conversion or dismissal. Section 1112(b) of the Code provides, in relevant part, that:
 
 
 31
 [O]n request of a party in interest, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause including--
 
 
 32
 (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
 
 
 33
 (2) inability to effectuate a plan;
 
 
 34
 (3) unreasonable delay by the debtor that is prejudicial to creditors;
 
 
 35
 (4) failure to propose a plan under section 1121 of this title within any time fixed by the court;
 
 
 36
 ....
 
 
 37
 11 U.S.C. Sec. 1112(b). Section 1112 clearly provides the bankruptcy court with the requisite authority to terminate a Chapter 11 case based on a showing of unreasonable delay, or continuing losses coupled with the absence of a reasonable likelihood of rehabilitation, or inability to effectuate a plan of reorganization. The inquiry under Sec. 1112 is case-specific, focusing on the circumstances of each debtor. In the case of most Chapter 11 debtors, however, a plan of reorganization can be effectuated, if at all, within a matter of months, not years. An occasional Chapter 11 debtor, for example, one with a complex debt structure or multifarious business problems, may require more time. However, the existence of such a debtor is the exception, not the rule. The charge to the bankruptcy judge under Sec. 1112, then, is to evaluate each debtor's viability and rate of progress in light of "the best interest of creditors and the estate."
 
 
 38
 Finally, we note that Congress, in 1978, expressly recognized the problems faced by creditors of a debtor who unreasonably delays in proposing a plan of reorganization. In Sec. 1121 of the Bankruptcy Code, Congress gave the debtor a period of 120 days, after the commencement of the Chapter 11 case, during which the debtor has the exclusive right to file a plan of reorganization. Thereafter, if the debtor has not filed a plan, any party in interest, including any creditor, may file a plan. The 120-day period may be reduced or increased for cause, on request of a party in interest, after notice and a hearing.
 
 
 39
 The limited exclusivity period which is a feature of Chapter 11 proceedings under the Bankruptcy Code contrasts with the procedure under Chapter XI of the Bankruptcy Act which gave the debtor the exclusive right, throughout the Chapter XI proceedings, to propose a plan. The House Report accompanying H.R. 8200 noted that "[t]he exclusive right [under old Chapter XI] gives the debtor undue bargaining leverage, because by delay he can force a settlement out of otherwise unwilling creditors." House Report, supra, at 231, U.S.Code Cong. & Admin.News 1978, p. 6191. Additionally, Sec. 1121 represents a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise.[15]
 
 
 40
 While we are not called upon here to decide what factors constitute "cause" for the extension of the exclusivity period, we think that any bankruptcy court involved in an assessment of whether "cause" exists should be mindful of the legislative goal behind Sec. 1121. The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.
 
 
 41
 Our brief review of the important creditor-protection provisions of the Bankruptcy Code demonstrates the inaccuracy of United's assertion that our construction of the adequate protection provisions leaves the secured creditor unable to enforce its rights. Congress clearly intended to provide a wide range of remedies for the secured creditors of a debtor that does not have a reasonable possibility of reorganizing or that unreasonably delays in its efforts to reorganize. It remains for the courts to effectuate those remedies.III.
 
 
 42
 The creditor-protection provisions of the Bankruptcy Code reviewed in Part II of this opinion can be made meaningful only by bankruptcy judges who are equally sensitive to the need for creditor protection as to the need for protecting the debtor's right to reorganize.
 
 
 43
 A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors. The secured creditor benefits from a successful reorganization because its secured claim is valued on a going-concern basis in connection with a plan of reorganization, and the secured creditor is not compelled to liquidate its collateral at forced-sale prices. However, when there is no reasonable likelihood that the statutory objective of reorganization can be realized or when the debtor unreasonably delays, then the automatic stay and other statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries. In that situation it is incumbent upon the bankruptcy judge to effectuate the provisions of the Bankruptcy Code for the protection of creditors lest the judge keep the Code's word of promise to the ear of creditors and break it to their hope. The bankruptcy judge must meet head-on his obligation to decide, fairly and impartially, the hard questions.
 
 
 44
 Early and ongoing judicial management of Chapter 11 cases is essential if the Chapter 11 process is to survive and if the goals of reorganizability on the one hand, and creditor protection, on the other, are to be achieved. In almost all cases the key to avoiding excessive administrative costs, which are borne by the unsecured creditors, as well as excessive interest expense, which is borne by all creditors,[16] is early and stringent judicial management of the case.[17] We recognize that Congress, in 1978, amended the bankruptcy laws with the intention of removing bankruptcy judges from the administration of the debtor's estate.[18] The purpose of this amendment was to insure the impartiality of the bankruptcy judge. We do not believe, however, that Congress thereby intended to relieve the bankruptcy judge of the responsibility of managing the cases before him in such a way as to promote the objectives and goals of the Bankruptcy Code. Our conclusion in this respect is strengthened by the fact that the bankruptcy court is an adjunct of the district court. District court judges function under Fed.R.Civ.P. 16 with full power and responsibility to manage their cases and with the directive to move their cases in such a way as to promote fairness to the parties and judicial economy. These responsibilities are not incompatible with their judicial function; indeed, they are at the core of it. We recognize that the line between administration of the debtor's estate that would jeopardize the bankruptcy judge's impartiality and effective case management may sometimes be a difficult one to draw. Nevertheless, we think that each bankruptcy judge is called upon to manage the cases in front of him, fairly and impartially, in such a way as to promote their orderly and prompt disposition. The difficulty in ascertaining where the line is to be drawn cannot be an excuse for a judge's abdication of his responsibility to function as a judge.
 
 IV.
 
 45
 The district court's order is reversed to the extent that it ordered Timbers to pay $42,500 monthly for "adequate protection of foreclosure rights." This matter is remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 46
 REVERSED AND REMANDED.
 
 CLARK, Chief Judge, concurring:
 
 47
 I regret that I feel compelled to add even this bit to the tens of thousands of words published in panel opinion and majority and dissenting opinions of the en banc court. So much has been written, I fear the elemental principles which should govern this case may be lost without a separate summary.
 
 
 48
 In this one-asset bankruptcy reorganization, the bankruptcy judge and the district court adopted the position that Sec. 361 required that United Savings Association of Texas be paid periodic cash amounts representing lost opportunity cost because United could not foreclose its lien on the debtor's only asset.
 
 
 49
 I agree with the en banc majority that applying this mandatory construction could be error here, even though I do not agree that an award of such costs is always prohibited. I further agree that the bankruptcy judge should be reminded to adjudicate the rights of the parties before him in each case.[1]
 
 
 50
 Finally, I would give this bankruptcy court a few straightforward directions. First, look to see whether any controversy has endured the lengthy delay of the appellate process. Second, if so, then follow these basic principles in making your decision:
 
 
 51
 (a) Reorganization is not a Holy Grail to be pursued at any length. Creditors are entitled to a prompt determination of efficacy.
 
 
 52
 (b) The Bankruptcy Code recognizes only two classes of creditors: secured and unsecured. Neither class has rights superior to the other.
 
 
 53
 (c) Secured creditors are secured only to the extent of the value of their security.
 
 
 54
 (d) State law gives unsecured creditors a right similar to that of the secured creditor to foreclose his lien--the right to reduce their claims to judgment and pursue collection. Both rights are equally impaired by bankruptcy proceedings.
 
 
 55
 (e) The Code neither compels nor prevents a determination that delay in realizing on security should be compensated. To the extent such compensation can be made out of the value of the security, it may be ordered; to the extent it could impair the rights of unsecured creditors, it may not.
 
 
 56
 I concur in vacating the judgment appealed from and in remanding the cause to the bankruptcy court for proper adjudication under the principles stated above.
 
 
 57
 EDITH H. JONES, Circuit Judge, with whom GEE, JOLLY, HIGGINBOTHAM, and DAVIS, Circuit Judges join, dissenting:
 
 
 58
 The issue the majority addresses is, in their view, "simply one of statutory construction." Yet this "simple" inquiry produces a monumental elaboration whose end result is to reject the reasonable construction of 11 U.S.C. Sec. 361 reached by the Ninth Circuit, two other courts of appeals and numerous lower courts. The elaboration tends to obscure the fact that the majority have significantly modified, rather than interpreted, the adequate protection provision of the Bankruptcy Code. Like the Ninth Circuit, I find that a proper reading of Sec. 361 requires adequate protection of a secured creditor for the bankruptcy-created delay in enforcing his lien against collateral. The conclusion reached by the majority favors extended delay in the bankruptcy process, affirmatively harms secured creditors while benefitting only debtors, and will create a rush of forum-shopping by debtors into the already beleaguered bankruptcy courts of the Fifth Circuit. Because the majority have erred and the consequences of its error are profound, I respectfully dissent.
 
 
 59
 Recapitulating the legal posture of this case, Timbers' resort to relief under Chapter 11 of the Bankruptcy Code activated the automatic stay, 11 U.S.C. Sec. 362(a), the cornerstone of bankruptcy, and prevented action by creditors to collect Timbers' outstanding debt.[1] The secured creditor sought relief from the stay "for cause, including lack of adequate protection." 11 U.S.C. Sec. 362(d)(1). United Savings argues that "adequate protection" requires compensation for the delay bankruptcy causes in preventing foreclosure and its ability to realize value through its collateral. Hence, if Timbers cannot provide such protection--by way of payments during bankruptcy, additional liens or guarantees or some other method--United Savings may foreclose. The bankruptcy court was persuaded by this argument, which has been adopted by three circuit courts of appeals and rejected by none prior to today's decision.[2]
 
 
 60
 Section 361 of the Bankruptcy Code does not expressly state that a secured creditor, as an entity with an interest in the debtor's property, must receive compensation on account of its damages for delay in foreclosing. It provides as follows:
 
 
 61
 Sec. 361 Adequate protection.
 
 
 62
 When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by--
 
 
 63
 (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
 
 
 64
 (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
 
 
 65
 (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.
 
 
 66
 This Court's responsibility is to effectuate the "plain meaning" of the statutory language. Watt v. Alaska, 451 U.S. 259, 265-66, 101 S.Ct. 1673, 1677-78, 68 L.Ed.2d 80 (1981); American Mariner, 734 F.2d at 430. Unlike the majority, I find considerable support within Sec. 361 for a requirement that adequate protection compensate a secured creditor for the delay occasioned by bankruptcy.
 
 
 67
 According to Secs. 361(1) and (2), adequate protection must recompense the decrease in "value of [an] entity's interest in [the debtor's] property" where that decrease is caused by the automatic stay. Adequate protection must permit the creditor to realize the "indubitable equivalent" of his "interest in the debtor's property." Sec. 361(3). These emphasized phrases are critical to proper interpretation of Section 361.
 
 
 68
 The majority argue that the "value of an entity's interest in the debtor's property" means the "value of the collateral" and nothing more.[3] If Congress had wanted to limit adequate protection to a decline in the value of collateral, it could have done so, but it did not. Significantly, in enacting the Bankruptcy Judges, United States Trustee, and Family Farmer Bankruptcy Act of 1986 (hereafter, the "Family Farmer Act"), P.L. 99-554, Congress redefined adequate protection for creditors of farmers. Such secured creditors may receive compensation only to the extent of decreases "in the value of property securing a claim or of an entity's ownership interest in property." (emphasis added). 11 U.S.C. Sec. 1205. Congress there expressly confined adequate protection to the value of the collateral. The "value of an entity's interest" in the debtor's property, a broader term, therefore requires more careful analysis than the majority has performed.
 
 
 69
 One must consider the essential nature of a secured transaction according to state law in order to evaluate the impact of bankruptcy upon the "value" of the secured creditor's interest. In a bankruptcy case involving the rights of a secured creditor, the Supreme Court has observed that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 141-42 (1979).
 
 
 70
 A creditor ordinarily takes security because it has loaned money to a debtor in the expectation of being repaid at a later date. The security device is not the limit of its "interest" in the transaction, however.[4] The secured creditor's incentive to make the loan, and its profit, is the contract interest it will receive pending repayment of the principal. Taking collateral is but a means to accomplish this end. Absent bankruptcy, under state law, a debtor's default triggers the right of the secured creditor to obtain ownership of the collateral through foreclosure. The secured creditor then disposes of the collateral and, to the extent possible, restores its inventory of cash to re-lend at a profit.
 
 
 71
 The automatic stay in bankruptcy distorts the secured creditor's state-law rights in the collateral, not merely by denying him the "value" of the collateral as the majority contends, but also by delaying foreclosure. The cost of the delay additionally entails the income lost by the secured creditor while he is stayed from re-lending the value of the collateral. Put differently, the secured creditor is not so much deprived of a particular piece of property as he is deprived of the use of that property to obtain a certain amount of money at a certain time. The delay resulting from bankruptcy thus imposes a lost opportunity cost, measured upon the nominal value of the collateral, which would not beset the secured creditor under state law. An interpretation of Sec. 361 that effectuates the adequate protection of the "value of the entity's interest in the debtor's property" must recognize the time-value of the secured creditor's rights.
 
 
 72
 The majority do not deny that lost opportunity cost is a real, measurable damage inflicted on a secured creditor by the delay inherent in bankruptcy proceedings. Nonetheless, their lengthy exegesis of pre-Bankruptcy Code law and legislative history concludes that a secured creditor can not be "adequately protected" for delay damage.[5] The majority's limitation on the "value of the entity's interest in the debtor's property" thus subverts the basic goal of secured transactions and fails to construe Sec. 361 to minimize interference with state-law rights of the secured creditor, as required by Butner.
 
 
 73
 Contrary to the majority opinion, the Ninth Circuit has held that the expansive phrase "the value of an entity's interest in such property" demonstrates a "general intention to protect a broad range of secured creditors' interests." American Mariner, 734 F.2d at 430. The secured creditor's right to take possession of and sell the collateral and his right to reinvest the proceeds of sale are valuable rights included in this phrase. 734 F.2d 430-31. Indeed, the House Report accompanying passage of the Bankruptcy Code emphasized the breadth of adequate protection:
 
 
 74
 It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy law. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor may not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.
 
 
 75
 H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 5787, 6295.
 
 
 76
 Further support for interpreting the value of a secured creditor's interest to include the cost of delay in realizing upon its collateral derives from the term "indubitable equivalent" in Sec. 361(3). This is a term of art, understood since Judge Learned Hand's opinion in In Re: Murel Holding Corp., 75 F.2d 941 (2d Cir.1935), to require compensation of the secured creditor for the time-value of its rights in collateral. Judge Hand explained adequate protection as follows:
 
 
 77
 In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence. (emphasis added)75 F.2d 942. The opinion went on to require that the secured creditor be paid interest on the value of its collateral following confirmation of a plan of reorganization. "Indubitable equivalent" also appears in 11 U.S.C. Sec. 1129(b)(2)(A)(iii), where it specifically complements a present-value component to a secured creditor's rights in the event a plan is "crammed down" over his objection. In this section, Murel Holding is codified.
 
 
 78
 The majority do not deny Judge Hand's meaning when he used the phrase, or the significance that his meaning may hold for construing Sec. 361(3). The majority acknowledge the plausibility of the statutory construction reached in American Mariner and numerous cases following it. See In re Deeter, 53 B.R. 623, 626 (Bankr.N.D.Ind.1985). Despite these concessions, the majority overcome the "plain meaning" of the statute by concluding that they "do not place significant weight on the action of the conferees when they added the phrase 'indubitable equivalent' to Sec. 361." One may agree with the majority that the legislative history does not explain why "indubitable equivalent" was introduced into Sec. 361(3). But see majority opinion fn. 28, acknowledging that Congress had the idea of compensation for time-delay before it. After considerable speculation concerning what may or may not have happened in Congress, the majority arrives at its ultimate proposition: that Congress was unaware of the origin and meaning of "indubitable equivalent." In light of the specific Congressional approval of Judge Hand's concept of adequate protection in Sec. 1129(b)(2)(A) this seems most unlikely; and curious effect of the majority's legislative analysis is to religate the effect of "indubitable equivalent" to that of a mere precatory expression in Sec. 361(3), while according it full scope in Sec. 1129(b)(2)(A). A sounder and more logical view would be to interpret the phrase to require recognition of compensation for delay in both sections of the statute. Consistency in the meaning of language in a statute--and most certainly that of words of art--is not only a virtue, it is a hallmark of faithful statutory construction.
 
 
 79
 The majority, in sum, have construed the plain meaning of the statute by ignoring significant portions of its express language and by relying instead on what was not said in Congressional hearings.
 
 
 80
 The majority's method of statutory construction by omission reappears in the en banc supplement to the majority opinion concerning the Family Farmer Act.[6] The majority fail to note that Congress there was able to find the words needed to limit adequate protection to the value of the secured creditor's collateral. Certainly, the Family Farmer Act hearings in Congress evoked testimony from witnesses who disliked the perceived impact of American Mariner adequate protection requirements upon farmers, and Congress considered this in amending Title 11. Contrary to the implication of the majority, however, that "virtually all" of the witnesses "excoriated" American Mariner, half of the witnesses, including a bankruptcy judge and the representative of the prestigious National Bankruptcy Conference, did not seek any statutory rejection of American Mariner, and at most, some of them advocated only a mitigation of its perceived effects.
 
 
 81
 The Family Farmer Act itself proves that Congress did not reject a secured creditor's right to receive adequate protection of lost opportunity cost.[7] Congress removed the "indubitable equivalent" test and nominally confined adequate protection in family farmer cases to the value of the collateral. However, it substituted a provision, 11 U.S.C. Sec. 1205(3), allowing payment of "reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property ..." Provision of adequate protection by rent rather than "opportunity cost" payments to secured creditors, to the extent these concepts actually differ, squarely recognizes the secured creditor's entitlement to compensation for delay during bankruptcy. Rent is the quintessential measure of the time-value of real property. According to the majority, "this gives the bankruptcy judge the flexibility to award some compensation to the secured creditor...." Indeed it does. Poignantly, farmers in the Fifth Circuit will henceforth bear a higher adequate protection burden under this "relief" provision of the Family Farmer Act than will non-farm debtors. Congress could not have intended this cruel paradox.[8]
 
 
 82
 As an adjunct to rejecting the meaning of Sec. 361 endorsed by American Mariner and two other circuit courts, the majority cite the alleged inconsistency between payments of "interest" as American Mariner adequate protection and allowance of "interest" on claims pursuant to Secs. 502(b)(2) and 506(b). This dichotomy is fundamentally flawed and diverts attention from the broad scheme of the Bankruptcy Code, which is fully consistent with providing compensation for lost opportunity costs as an administrative expense. The "interest provisions" set forth two general principles. First, no claim by a secured or unsecured creditor against the debtor's estate is ordinarily allowed for interest "unmatured" at the date of the bankruptcy filing. 11 U.S.C. Sec. 502(b)(2). Accounting for the claims owed by the debtor at the date of bankruptcy thus avoids the complexity of frequent and uneven calculations of post-petition interest. Second, Sec. 506(a) divides the secured claim into a secured portion, based on the value of the creditor's collateral, and an unsecured portion which is treated like any other general unsecured claim. Section 506(b), itself an exception to Sec. 502(b)(2), allows claims by oversecured creditors to include accrued interest at the contract rate, as well as attorneys' fees and other costs provided by the agreement with the debtor.
 
 
 83
 These "interest" provisions must be viewed in the context of the purpose of Sec. 502 as a whole. Section 502, as qualified by Secs. 506(a) and (b), defines on a balance-sheet basis the claims against the debtor for purposes of making payments to creditors whenever a plan or liquidation is accomplished, if there is any dividend. Section 502 also constitutes a balance-sheet for other purposes, purposes such as classifying creditors [Sec. 1123(a)(1) ], determining the amount of claims for voting purposes [Sec. 1126(c) ], disclosing particular payments made pursuant to a plan [Sec. 1129(a)(4) ], and enabling a determination of the feasibility of a plan [Sec. 1129(a)(11) ]. The Sec. 502(b) "interest" provision, like the other balancesheet functions of Sec. 502, is subject to qualification as necessary to accomplish certain goals within the Bankruptcy Code. The treatment of oversecured creditors under Sec. 506(b) has been noted. Additionally, Sec. 726(a)(5) entitles unsecured creditors to payment of post-petition interest before the debtor may receive anything. If the majority's contention that Sec. 502(b) bars post-petition interest for undersecured creditors is correct, then undersecured creditors are inexplicably and irrationally denied the protection conferred on unsecured creditors by Sec. 726(a)(5). In a major exception to Sec. 502(b)(2), Sec. 1124 specifically permits reinstatement of a debt according to its original contract terms if the debtor brings current the payments of principal and interest accrued during bankruptcy. Section 502(b)(2) is not so seamless a web, excluding all payments of "interest", as the majority suggests.
 
 
 84
 Moreover, Section 506(b) should be viewed not as an inferential limit on the treatment afforded secured creditors, but as a baseline guarantee of the rights of the oversecured creditor. By this reckoning, the oversecured creditor maintains a safe harbor in Sec. 506(b) and need not even seek adequate protection in court. Allowance of his full contract claim against the debtor is assured. Of course, if the bankruptcy, by delay or otherwise, threatens the security of this creditor, he may seek relief under Sec. 361. To say that the undersecured creditor lacks the definitive safe harbor is not to conclude that he receives no protection at all. The extent of the undersecured creditor's right to adequate protection must be decided by the court, however; and it differs from his contract rights with the debtor. Section 506(b) therefore constitutes an alternative to, rather than a limitation upon, the secured creditor's right to adequate protection. See Amicus Brief of Prof. Thomas H. Jackson at 26-28.
 
 
 85
 To suggest that adequate protection for lost opportunity cost conflicts with the "interest" provisions proves too much; so, in theory, do adequate protection payments to secured creditors under Sec. 361 for depreciation, for maintaining the taxes and insurance payments on property, and for paying senior debt in order to protect a junior lienholder. In each case, payments are being made on behalf of the secured creditor during bankruptcy apart from and in addition to his right to file a claim for principal and accrued interest at the date of bankruptcy. Yet the majority do not quarrel with these other extra-contractual payments. The "interest provisions" are not themselves fully consistent with the majority's position. Under Sec. 506(a), a secured creditor's claim may be valued at different times during the bankruptcy for different purposes under the Code [e.g., Sec. 502 allowance of claim, Sec. 364 borrowing, Secs. 362 or 363 adequate protection, Sec. 1129(b) cram-down]. A secured creditor could obtain a valuation early in the case that would entitle him to receive adequate protection for depreciation of the collateral and later, under Sec. 506(b), be found "oversecured" so as to demand full contract interest. This may present an unusual case, but it is clearly allowed by the Bankruptcy Code and is no more incongruous than reconciling opportunity-cost adequate protection with the "interest provisions."
 
 
 86
 The fact is that adequate protection payments of any sort are different from the restrictions created by the "interest provisions." The Bankruptcy Appellate Panel, which ruled against American Mariner's secured creditor before that case reached the Ninth Circuit, stated, "we do not agree with the court below that there is a negative implication to be derived from Sec. 506(b) which is applicable to Sec. 361." 27 B.R. 1004, 1009 (1983). First, "unmatured interest" proscribed by Sec. 502 or allowed under Sec. 506(b) accrues at the contract rate on the entire amount owed by the debtor. Adequate protection, however, is based on a Sec. 506(a) valuation of the collateral only, whether for depreciation or for lost opportunity cost purposes. Second, the market rate of interest rather than the contract rate governs adequate protection payments made pursuant to American Mariner. See Fortgang and Mayer, Valuation in Bankruptcy, 32 UCLA L.Rev. 1061, 1088 (1985). Third, opportunity-cost adequate protection compensates only for the delay caused by bankruptcy. Payments of this sort would not ordinarily commence at the filing of a bankruptcy petition, but only following the date when the secured creditor, absent bankruptcy, could have foreclosed upon his collateral. American Mariner, 734 F.2d at 435 n. 12.
 
 
 87
 Fourth, in contradistinction to contract interest, adequate protection for lost opportunity cost need not comprise cash payments at all. American Mariner emphasized that payments to the secured creditor are "by no means the only method" of providing adequate protection, 734 F.2d 435, as Sec. 361 explicitly states. For instance, if the debtor owned an office building or real estate development in the process of completion at the date of bankruptcy, and if he offered to complete construction or to embark on an ambitious sales or leasing program as adequate protection for the secured creditor, these activities might suffice and supplant the need for any adequate protection payments for lost opportunity cost. The majority focus on cash payments to exaggerate the perceived conflict between American Mariner and the "interest provisions."[9]
 
 
 88
 Compensating the secured creditor for its lost opportunity cost due to bankruptcy delay is consistent with the treatment of all other "administrative" costs of the bankruptcy proceeding. The costs of doing business as a debtor are paid currently and in full during the proceeding, and, whether they are incurred for attorneys and accountants, for the purchase of goods, or for payment of a post-petition tort claim, are borne by the debtor and its unsecured creditors. 11 U.S.C. Secs. 328, 330, 503(b), 507(a)(1), 726. The majority has mistakenly suggested that "all creditors generally share some of the risk": section 506(c), however, allows the estate to recover from a secured creditor only the necessary costs and expenses of preserving or disposing of the collateral. Additionally, the Bankruptcy Code is permeated by requirements of special administrative payments during a case to special varieties of creditors. A lessor is entitled to have all prepetition defaults cured within a short period after bankruptcy before he need suffer the continued tenancy of a bankrupt. 11 U.S.C. Sec. 365(b). Any party to an "executory contract," such as a long-term supply contract or an oil and gas operating agreement, may similarly obtain from the debtor full performance plus additional "assurance" as the quid pro quo for continued dealings. Id. Section 1110 allows repossession of aircraft or vessels subject to certain financing arrangements if, within 60 days of the filing, all defaults are not cured. The obligations covered by these provisions are funded by the debtor and its unsecured creditors.
 
 
 89
 An undersecured creditor, no less than a lessor, has property at risk during the reorganization. He is "doing business" with the debtor by virtue of a forced loan of his collateral. American Mariner recognizes, as do the majority, that the true cost of the secured creditor's forced loan includes the time-value of delay in foreclosing. American Mariner draws an implicit and reasonable analogy between the rights of a secured creditor under Secs. 361(1) and (3) and post-petition "administrative rent," which the debtor must continue to pay currently after seeking protection in bankruptcy. 11 U.S.C. Sec. 503(b). "Administrative rent" typically includes both projected depreciation of the leased property plus a return on the lessor's investment and thus recognizes the potential income from alternative uses. 2 Collier on Bankruptcy p 365.03 (15th Ed.1986). The Family Farmer Act, as previously noted, has codified this analogy.
 
 
 90
 Under the foregoing analysis, the only "inconsistency" between administrative payments of any kind during bankruptcy and the Sec. 502 scheme for allowance of claims lies in Congress's decision to require the debtor, as his cost of taking advantage of bankruptcy's automatic stay and opportunity for discharge of debt, to pay his post-petition expenses and certain other obligations currently. Treating as an administrative expense the adequate protection of the secured creditor's "interest in the debtor's property," including lost opportunity cost, is a wholly different matter from the Sec. 502(b)(2) balance-sheet disallowance of claims for unmatured interest on the contract.[10]
 
 
 91
 The statutory and legislative history arguments of the majority have been analyzed. Their policy views must also be addressed. Pervasive in the original panel opinion, reinstated by the majority, was the notion that if American Mariner is correctly decided, a massive transfer of assets from unsecured creditors to undersecured creditors will result, aborting the reorganization process. This seems to be the basic concern that led the majority to traverse the holdings of three circuit courts and most of the bankruptcy courts in this circuit. The majority's fear is based on a misperception of the nature of most Chapter 11 filings under the Bankruptcy Code. It obscures the peril in which an undersecured creditor is placed by the filing of a Chapter 11 petition and ignores the benefit that his peril confers in the form of a forced loan of his collateral to the debtor. Finally, while conceding that American Mariner may provide a vehicle whereby the debtor can remain in reorganization with the cooperation of the secured lender for a period of time, the majority incredibly suggest that such an outcome could prejudice the unsecured creditors.
 
 
 92
 The majority have assumed that all or most Chapter 11 reorganizations have a right to life which is endangered by the prospect of payment of adequate protection for the secured creditor's lost opportunity cost. The sad fact is, on the contrary, that the vast bulk of reorganizations culminate in liquidation by a plan, conversion to Chapter 7, or withering away during the bankruptcy proceedings. Over the last five years, the Administrative Office of the United States Courts reports that 90% of Chapter 11 cases nationwide failed to terminate within the provisions of Chapter 11. Of those in which plans are confirmed, the experienced bankruptcy practitioner knows that many plans call for liquidation of the debtor's assets. Thus, the concern that American Mariner adequate protection frustrates the "reorganization policy" of bankruptcy law is irrelevant to the 90% of cases which ultimately liquidate. Compare Jackson, Of Liquidation, Continuation, and Delay: An Analysis of Bankruptcy Policy and Non-Bankruptcy Rules, 60 Am.Bankr.L.J. 399, 416 (1986).
 
 
 93
 The actual impact of American Mariner in unreorganizable cases should be favorable for secured and unsecured creditors alike. A hapless Chapter 11 effort may be kept aloft, absent American Mariner, for years, given moderately astute debtor's counsel, a court too busy or too docile to terminate the case, and a steady cash flow. The debtor survives in the meantime by consuming its assets, including any going-concern surplus that may have originally existed in the company, by suffering piecemeal foreclosures or, in some cases, by siphoning off cash and assets illegally. To the extent that a secured creditor is entitled to adequate protection to compensate for the opportunity cost of delaying foreclosure, his right takes the profit out of the debtor's standard tactic of delay. If the debtor is thus forced to close down sooner than it otherwise would have, some equity may remain for the unsecured creditors and they will be paid sooner. The administrative carrying costs of bankruptcy, including attorneys' and other professionals' fees, are reduced in this situation, where they would ultimately have been spent for naught. Shortening the bankruptcy proceeding by the threat of an award of American Mariner adequate protection (since in this type of case it is unlikely that any payments would ever be made) cannot possibly favor the interest of secured creditors over unsecured creditors. Both classes share its benefits. Moreover, there is a social gain from rendering bankruptcy more expeditious and facilitating the transfer of assets from nonproductive to productive ventures.
 
 
 94
 This case exemplifies the horde of hopeless bankruptcy cases in which the national reorganization policy is irrelevant. A one-asset limited partnership, Timbers has no full-time employees and no business except the rental of one unit of apartments. Its major unsecured debt is owed to the insider management company, while the rest of the unsecured debt totals $17,000. United Savings is the only secured creditor. Award of adequate protection based on lost opportunity cost does not thwart the debtor's right to reorganize if there was nothing to reorganize in the first place.[11]
 
 
 95
 This Court unanimously endorses tighter supervision of bankruptcy cases such as this by both the lower courts and interested parties to limit patent abuses of Chapter 11. Consequently, the majority's extended discussion of creditor remedies available under the Bankruptcy Code is helpful, if somewhat pallid compared with the overriding concern for the debtor and "reorganization policy" expressed in the original panel opinion. The trouble with creditors' remedies (e.g., lifting the automatic stay because the property is not necessary to an effective reorganization [Sec. 362(d)(2) ], seeking conversion to Chapter 7 or appointment of a trustee [Sec. 1112], and limiting the debtor's exclusivity period [Sec. 1121] is that in practice, as shown by the case statistics, they have not been enforced. Thus, the majority's exhortation that bankruptcy courts be "sensitive" to creditors' rights under the Bankruptcy Code is an unsatisfactory substitute for enforcing the statutory requirement that adequate protection include compensation for a secured creditor's lost opportunity cost.
 
 
 96
 What will be the effect of adequate protection for lost opportunity cost in the few cases that have a realistic chance to reorganize? I believe that, contrary to the panel's opinion, American Mariner motivates all parties to the case to reach a prompt agreement to a plan. At the very least, it will galvanize the debtor, who is always the key figure in arriving at a successful plan. The objective candidate for a successful Chapter 11 reorganization is not hard to describe: it has some cash and a decent cash flow, encumbered or not; it has at least some lines of business that are profitable or nearly so; it has good management; and it is not facing a disastrous economic forecast in all of its markets. Given those conditions, if a court awards adequate protection recognizing the secured creditor's cost of delaying foreclosure, the debtor will not usually collapse, because it can afford some level of such protection; but it will propose a plan. Aside from debtor procrastination, the most significant source of delay in the potentially successful cases is bickering among creditor groups. American Mariner forces creditor groups to focus their attention rapidly on a potentially dwindling pie. Even if the panel is correct in its assertion that a secured creditor receiving adequate protection payments for lost opportunity cost would be disinclined to negotiate (a conclusion I do not share), the cram-down provision of the Bankruptcy Code, Sec. 1129(b), takes the matter of delay out of the secured creditor's hands and always creates settlement incentive.
 
 
 97
 Two other points should be made about American Mariner's impact on the reorganizable company. First, in such a case, the majority's fear that payments to secured creditors will swamp the ship within a few weeks or months of the bankruptcy filing is misplaced. Both American Mariner and Grundy, the Fourth Circuit case, delay imposing opportunity-cost adequate protection in accord with the time ordinarily needed to effect a foreclosure and sale under state law. The court below triggered payments in six months from its ruling. An automatic breathing-space results for the debtor. Second, the panel's concern that American Mariner subverts the reorganization process by transferring the cost from secured to unsecured creditors depends upon one's point of view. If the effect of American Mariner in the reorganizable case is to speed up the proceedings, this fact alone should benefit unsecured creditors by reducing the transaction costs of the bankruptcy. Also, to the extent that adequate protection for lost opportunity cost is taken into account in the formulation of a plan, reducing the principal on outstanding debt, encouraging the secured creditor to modify his security or to cooperate in stretching out payments after bankruptcy, the debtor's and unsecured creditors' prospects are ultimately improved.
 
 
 98
 Providing adequate protection to the secured creditor for his lost opportunity cost occasioned by bankruptcy is not the foe of the reorganization process. I can do no better to summarize the position of the dissent than to quote from American Mariner:
 
 
 99
 The secured creditor's right to take possession of and sell collateral on the debtor's default has substantial, measurable value. The secured creditor bargains for this right when it agrees to extend credit to the debtor and both parties consider the right part of the creditor's bargain. The right constitutes an "interest in property" that is "created and defined by state law," and we are aware of no federal interest that requires this right of the secured creditor to go unprotected "simply because an interested party is involved in a bankruptcy proceeding." See Butner v. United States, 440 U.S. 48, 54-55, 99 S.Ct. 914, 917-18, 59 L.Ed.2d 136 (1979). The Court in Butner observed that "[u]niform treatment of property interests by both state and federal courts within a State serves ... to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' " 440 U.S. at 55, 99 S.Ct. at 918 (quoting Lewis v. Manufacturers National Bank, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)). To the extent that the debtor in bankruptcy can prevent the secured creditor from enforcing its rights against collateral while the debtor benefits from the creditor's money, the debtor and his unsecured creditors receive a windfall at the expense of the secured creditor.
 
 
 100
 We conclude that sections 361 and 362(d) were drafted to preclude such a windfall and to insure that the secured creditor receives the benefit of its bargain. We are satisfied that our holding in this case will not inhibit successful reorganization but rather will promote among other things the ready availability of affordable credit.
 
 
 101
 I respectfully DISSENT.
 
 
 
 [1]
 Terms defined in the panel opinion are used herein as therein defined
 
 
 [2]
 In 1981, the House Subcommittee on Courts, Committee on the Judiciary, held hearings on the effect of the Bankruptcy Reform Act of 1978. These hearings, which are included in the legislative history of Pub.L.No. 98-353, were in the nature of oversight; they did not concern any particular pending legislation. The automatic stay was discussed only twice in the course of those proceedings. Richard Levin, an attorney on the staff of the House Judiciary Committee, stated:
 [T]he new automatic stay of Sec. 362 and the provisions for relief from the stay appear to be working well. The compromises that were forged in that area after extensive discussion and debate seem to protect the interests involved, by insuring reasonably expeditious and fair resolution of automatic stay disputes.
 Hearings on The Bankruptcy Reform Act of 1978 Before the Subcomm. on Courts of the Senate Comm. on the Judiciary, 97th Cong., 1st Sess. 312 (1981). Another witness, Lloyd D. George, Bankruptcy Judge for the District of Nevada, stated that "[t]he standards for granting relief from the automatic stay provisions of 11 U.S.C. 362, the times for filing plans, and even the types of procedures available to particular creditors are much clearer under the new code." Id. at 206. He continued by observing that most of those whose interests lay on the side of the creditor "thought that the drafters of the code had struck a reasonable balance between the conflicting interests of debtors and their creditors." Id. at 207.
 These statements were made in April 1981, at a time when no court had espoused, in a published opinion, the position adopted three years later by the Ninth Circuit in American Mariner. No proposed amendments to Secs. 361 or 362(d) arose out of these hearings.
 
 
 [3]
 In November 1985, the Subcommittees on Administrative Practice and Procedure, and Courts, Senate Committee on the Judiciary, held hearings on the family farm bankruptcy problem. In his comments to the subcommittees regarding various proposals before the Senate, Richard F. Stageman, Bankruptcy Judge for the Southern District of Iowa, observed that:
 [A] farmer is forced to compensate creditors for the delay in the enforcement of their rights caused by the Chapter 11 created "breathing space". In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984). The Eighth Circuit has adopted this burdensome concept in In re Martin, 761 F.2d 472 (8th Cir.1985)....
 ....
 Unfortunately, the vast majority of farm debtors are unable to provide creditors with adequate protection under the Martin analysis. Judge Fagg speaking for the Martin court states that "the concerns we express are not insurmountable" to which I as a work-a-day bankruptcy judge would offer--neither is Mount Everest.
 The Question of the Remedies Available to Debtors and Creditors under Bankruptcy, How they Relate to the Great Plight of the American Farm and the Farm Family: Hearings Before the Subcomms. on Admin. Practice and Procedure, and Courts of the Senate Comm. on the Judiciary, 99th Cong., 1st Sess. 51-52 (1985) [Hereinafter cited as Farm Family Hearings ]. In his prepared statement to the subcommittees, Judge Thomas M. Moore, Bankruptcy Judge in the Eastern District of North Carolina, echoed this sentiment:
 At least two Circuit Courts of Appeal have held that "adequate protection" requires the debtor to compensate the secured creditor for "lost opportunity costs" in those cases where the value of the collateral is less than the amount of debt secured by the collateral. In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984); Grundy National Bank v. Tandem Mining Corporation, 754 F.2d 1436 (4th Cir.1985)....
 Our district is in the Fourth Circuit and payment for "lost opportunity costs" is required for adequate protection where the value of the collateral is less than the amount of the secured debt owed the creditor. However, the farmers in our district are unable to pay "lost opportunity costs." In fact, most of them are unable to pay an attorney a reasonable retainer for filing the petition. This requirement for the payment of "lost opportunity costs" is the first and one of the biggest obstacles faced by the farmer-debtor. Unless the requirement for payment of "lost opportunity costs" is modified, the farmer in our district will not have the time to formulate and file a plan of reorganization.
 Id. at 177-78.
 Bankruptcy attorney R. Fred Dumbaugh commented to the subcommittees that
 [t]he Farmer-Debtor's case can ... be 'won or lost' at a very early stage in the reorganization efforts, depending upon the outcome of stay litigation. Given the recent trend in case law interpretation of the requirements of adequate protection, the risk to the Farmer-Debtor increases each day. See, In Re American Mariner Industries, 734 F.2d 426 (9th Cir.1984).
 Id. at 117. William L. Needler, another bankruptcy attorney, suggested that "Congress should specifically overrule the American Mariner case and Lend Lease v. Briggs Transportation Co., Civ. 3-84-224 (D.Minn. Sept. 26, 1984), both of which set impossible guidelines for adequate protection in reorganization proceedings." Id. at 267-68.
 
 
 [4]
 A bankruptcy practitioner described the situation as follows:
 [A] great deal of the time and resources of the Farmer-Debtor are spent in negotiations and litigation involving stay motions. By a large margin, stay motions consume more time and resources of the Debtor than any other aspect of the case.... In many cases, a motion for relief from the automatic stay is a "knee-jerk" reaction to the filing of the Bankruptcy Petition. Many creditors see stay motions as a way to defeat the reorganization effort at an early stage, or to demand a "larger chunk of the pie" than they might otherwise get had no stay motion been filed.
 The reason why the Farmer-Debtor must spend so much time and resources in combatting stay litigation is that there is so much "at risk" for the Farmer-Debtor should the movant prevail in having the automatic stay terminated.... Given the recent trend in case law interpretation of the requirements of adequate protection, the risk to the Farmer-Debtor increases each day. See, In re American Mariner Industries, 734 F.2d 426 (9th Cir.1984).
 Farm Family Hearings, supra, at 116-17 (statement of R. Fred Dumbaugh).
 
 
 [5]
 Additionally, the author noted that the Committee felt that the American Mariner decision
 (3) erroneously equates "indubitable equivalent" of the secured creditor's interest in the collateral in section 361(3) to "indubitable equivalent" of the secured claim in section 1129(b)(2)(A)(iii), where the latter phrase appears as an alternative to the discounted present value "as of the effective date of the plan" of deferred cash payments under the plan; (4) ignores the statutory scheme, which is that adequate protection under section 361 [with the back-up of super priority under section 507(b) ] was designed to preserve only the value of the secured creditor's interest in the collateral in order to fix the amount of the secured claim, which must then be fully compensated by present value under the plan, whether the plan is confirmed under section 1129(a)(7) or under section 1129(b)(2)(A); (5) allows an undersecured creditor to obtain, early in the proceeding, the full value of its claim on the encumbered collateral, although the value of the unsecured creditors' claims on unencumbered collateral remains at risk throughout the case; and, at the same time, gives the undersecured creditor postpetition interest on the secured part of its claim by way of adequate protection, although section 506(b) does not allow any postpetition interest as part of the secured portion of the undersecured claim; (6) will jeopardize many reorganizations by enabling secured creditors to obtain, early in the Chapter 11 case, the full value of their claims, whereas the statutory scheme requires that they receive that value only on confirmation of a plan.
 
 
 [132]
 Cong.Rec. S15090 n. 187 (daily ed. Oct. 3, 1986) (article by John C. Anderson) (emphasis in original)
 
 
 [6]
 In the same article, the author described the "growing trend of cases interpreting the legislative history of the Code to require a more stringent standard of indubitable equivalence than this writer believes is consistent with the spirit of reorganization concepts," and cited American Mariner as an example. 132 Cong.Rec. S15085 (daily ed. Oct. 3, 1986) (article by John C. Anderson)
 During the hearings before the Subcommittees on Administrative Practice and Procedure, and Courts, Senate Committee on the Judiciary, one witness noted that:
 Recently, adequate protection has also been interpreted to require payments to secured creditors based upon opportunity cost. See, In Re American Mariner, 734 F.2d 426 (9th Cir.1984)....
 ... However, interest payments to an undersecured creditor seems inconsistent with Sec. 506(b) of the Code, which provides for the accrual of post-petition interest only if the collateral is worth more than the debt.
 Some courts have seen this apparent inconsistency as sufficient grounds for refusing to order adequate protection payments for opportunity cost. See, In Re South Village, Inc., 25 B.R. 987 (1982)....
 The reports accompanying the Bankruptcy Code support the South Village result. H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin.News, P. 6295; S.Rep. 95-989, 95th Cong., 2nd Sess. 54 (1978), U.S.Code Cong. & Admin.News, P. 5840. These reports indicate Congress had in mind the protection of loss in value of the collateral due to depreciation in that value. Perhaps Congress should now make that intention explicit by amending Sec. 361 to Sec. 363 to exclude adequate protection for opportunity cost.
 Farm Family Hearings, supra, at 250-51 (statement of Terry M. Anderson).
 
 
 [7]
 In a statement submitted at the hearings on the family farm bankruptcy problem, one witness urged that "[t]he provisions of section 361 ... be amended to clarify the adequate protection definition," Farm Family Hearings, supra, at 266 (statement of William L. Needler), and went on to suggest that "[t]he Code should ... be changed to make it clear that the decision of the 9th Circuit Court of Appeals in American Mariner, 734 F.2d 426, 1984 is abolished." Id. at 267. Echoing this sentiment, another witness suggested that "[p]erhaps Congress should now make [its] intention [to protect the loss in value of the collateral due to depreciation in that value] explicit by amending Sec. 361 to Sec. 363 to exclude adequate protection for opportunity cost." Id. at 251 (statement of Terry Anderson)
 As might be expected, a representative of the Independent Bankers Association of America stated:
 [W]e support the American Mariner decision since it strikes an appropriate balance between the right of a debtor to secure a "breathing space" from his creditors through the automatic stay and the right of a creditor to receive compensation for being unable to demand prompt payment or to foreclose and take possession of the collateral. Congress does not need to take further action on this issue.
 Id. at 156 (statement of John C. Dean).
 
 
 [8]
 Section 1205 provides:
 "(a) Section 361 does not apply in a case under this chapter.
 "(b) In a case under this chapter, when adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by--
 "(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;
 "(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;
 "(3) paying to such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property; or
 "(4) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will adequately protect the value of property securing a claim or of such entity's ownership interest in property.
 Family Farmer Bankruptcy Act of 1986, Sec. 1205 (to be codified at 11 U.S.C. Sec. 1205).
 
 
 [9]
 In Price, the Supreme Court considered whether a subsequent legislative development changed its view of Sec. 272(a)(1) of the Internal Revenue Code. The subsequent legislative development at issue was the failure of Congress to adopt a House subcommittee recommendation to expressly repudiate certain court decisions. The Supreme Court stated that "[t]his recommendation was not adopted, and from the failure to act, respondent would have us infer an acceptance by Congress of the Ninth Circuit's position. Such nonaction by Congress affords a most dubious foundation for drawing positive inferences." 361 U.S. at 310-11, 80 S.Ct. at 330
 
 
 [10]
 Throughout the proceedings during which various family farm bankruptcy proposals were considered, the emergency nature of the problem and the limited scope of the proposed solutions were recognized. See, e.g., Farm Family Hearings, supra, at 2 (statement of Sen. John P. East) ("The problem we are confronted with today is a depression on the American farm. I do not think it is an exaggeration to say a depression. We are trying to be responsive to that compelling need.... What we hope to do here this morning is to begin a modest venture of seeking possible avenues to relieve this financial burden on the family farm."); Id. at 27 (statement of Rep. Mike Synar) ("It is critical that the problems of the Bankruptcy Code be worked out soon because, as we all know, the farm crisis is getting worse.... [The bill] does not attempt to overhaul the Bankruptcy Code or alter existing policies."); Id. at 59 (statement of Richard Stageman) ("[T]hese amendments ... designed to treat a special group in a unique situation...."); 132 Cong.Rec. S15075 (daily ed. Oct. 3, 1986) (statement of Sen. Thurmond) ("The family farm provisions of [H.R. 5316] are an extraordinary response to what is, hopefully, a temporary crisis."); 132 Cong.Rec. H9001 (daily ed. Oct. 2, 1986) (statement of Rep. Fish) ("A new chapter 12 for family farmers, patterned in a number of respects after existing chapter 13, is tailored specifically to the realities of a nationwide farm crisis.")
 
 
 [11]
 Under 11 U.S.C. Sec. 362(g), the secured creditor has the burden of proof on the issue of the debtor's equity in the property and the debtor has the burden of proof on all other issues
 
 
 [12]
 See, e.g., In re Pacific Tuna Corp., 48 B.R. 74, 78 (Bankr.W.D.Tex.1985) ("reasonable possibility of a successful reorganization of the debtor within a reasonable time"); In re Development, Inc., 36 B.R. 998, 1005 (Bankr.D.Haw.1984) ("reasonable likelihood of a successful reorganization within a reasonable period of time"); In re Martin, 19 B.R. 496, 498 (Bankr.E.D.Pa.1982) ("reasonable probability that [debtor] will be able to propose a plan that will result in a successful reorganization"); In re Dublin Properties, 12 B.R. 77, 81 (Bankr.E.D.Pa.1981) ("reasonable probability that [debtor] will be able to propose a plan that will result in its successful reorganization"); In re Accent Assocs., Inc., 8 B.R. 933, 936 (Bankr.D.Mass.1981) ("reasonable possibility of an effective reorganization within a reasonable time") (emphasis in original); In re Terra Mar Assocs., 3 B.R. 462, 466 (Bankr.D.Conn.1980) ("reasonable possibility of a successful reorganization within a reasonable time")
 
 
 [13]
 See, e.g., In re Albany Partners, Ltd., 749 F.2d 670, 673 n. 7 (11th Cir.1984) ("[I]t must be demonstrated that an effective reorganization is realistically possible; the mere fact that the property is indispensible to the debtor's survival is insufficient."); In re Mikole Developers, Inc., 14 B.R. 524, 527 (Bankr.E.D.Pa.1981) ("debtor's high hopes for reorganization or need alone for the property is not the sine qua non under Section 362(d)(2)"); In re Dublin Properties, 12 B.R. at 81 ("more than a mere financial pipe dream"); In re Clark Tech. Assocs., Ltd., 9 B.R. 738, 740 (Bankr.D.Conn.1981) ("If all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that a reorganization in the near future is likely, it cannot be said that the property is necessary to an 'effective' reorganization."); In re Terra Mar Assocs., 3 B.R. at 466 (" 'Indispensability of the property to the debtor's survival and hope of rehabilitation is not enough ... to justify continuation of the stay when rehabilitation is hopeless....' "); see also Grundy Nat. Bank v. Tandem Mining Corp., 754 F.2d 1436, 1440 (4th Cir.1985) ("Sec. 362(d)(2)(B) presupposes that the property must be necessary to an 'effective ' reorganization if relief from the stay is to be properly denied.") (emphasis in original)
 
 
 [14]
 Because a plan of reorganization under Chapter 11 can, at least since 1978, consist of a liquidation of the debtor, there may be circumstances under which the debtor is able to satisfy the "effective reorganization" test of Sec. 362(d)(2) by showing that the property at issue is necessary to an effective liquidation of the debtor under Chapter 11, as distinguished from an effective rehabilitation of the debtor. See generally In re Koopmans, 22 B.R. 395 (Bankr.D.Utah 1982)
 
 
 [15]
 In explaining the purpose and function of what is now Sec. 1121, the House Report notes:
 Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days. In most cases, 120 days will give the debtor adequate time to negotiate a settlement, without unduly delaying creditors. The court is given the power, though, to increase or reduce the 120-day period depending on the circumstances of the case. For example, if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement. If, on the other hand, a debtor delayed in arriving at an agreement, the court could shorten the period and permit creditors to formulate and propose a reorganization plan. Again, the bill allows the flexibility for individual cases that is unavailable today.
 House Report, supra, at 231-32, U.S.Code Cong. & Admin.News 1978, pp. 6191, 6192 (footnotes omitted).
 
 
 [16]
 Interest payable to the oversecured creditor is discussed in the panel opinion, 793 F.2d at 1386
 
 
 [17]
 Statistics compiled by the Administrative Office of United States Courts reflect that on a nationwide basis, only thirteen percent of the Chapter 11 cases terminated in 1985 were fully administered under Chapter 11, as distinguished from being dismissed or otherwise disposed of; in the Fifth Circuit in 1985, only five percent were fully administered. These statistics make it amply clear that in the vast majority of Chapter 11 cases, the statutory objective of reorganization cannot be realized. The challenge to the bankruptcy courts is to recognize these cases as promptly as possible and thereby to limit the administrative expense and other costs (including interest expense) borne by creditors
 
 
 [18]
 Congress intended, through its enactment of the 1978 Bankruptcy Code, to "separat[e] ... the administrative and judicial functions of the bankruptcy judge," so that the bankruptcy courts could "become fair and unbiased fora." House Report, supra, at 49, U.S.Code Cong. & Admin.News 1978, p. 6010. "[T]he bankruptcy judge [would] no longer be the chief executive officer of the bankrupt debtor but rather [would] be restricted to the resolution of disputes in an adversary context." Klee, The New Bankruptcy Act of 1978, 64 A.B.A.J. 1865, 1867 (1978). "The court's role should be limited to a judicial one, that is, dispute resolving, and it should play no administrative part in the continued operations of the debtor." King, Chapter 11 of the 1978 Bankruptcy Code, 53 Am.Bankr.L.J. 107, 112 (1979). The House Report accompanying H.R. 8200 quoted the recommendation of the Commission on the Bankruptcy Laws of the United States " 'that the bankruptcy judges be removed from the administration of bankrupt estates and be restricted to the performance of essentially judicial functions, that is, primarily to the resolution of disputes or issues involving adversary parties and matters appropriate for judicial determination.' " House Report, supra, at 50-51, U.S.Code Cong. & Admin.News 1978, pp. 6011, 6012
 
 
 [1]
 By adopting the panel opinion, the en banc court appears to reject In re Briggs Transportation Co., 780 F.2d 1339 (8th Cir.1985). The panel said Briggs gives "little guidance" about deciding future cases. This rejection gives an uncertain sound. Briggs says what I perceive the majority says--each case must be decided on its own facts and circumstances
 
 
 [1]
 This case verges on presenting a hypothetical controversy to the court, because Timbers' present cash flow is tens of thousands of dollars less than monthly debt service payments and the likelihood that Timbers will be able to reorganize is virtually nil. This was conceded by debtor's counsel in oral argument. As no fact finding was made on that issue below, and the parties being intent on achieving a definitive resolution of the adequate protection issue, I reluctantly conclude that the case should be decided by our court. It is indeed unfortunate, however, that nothing turns on the outcome of our decision in this case for these parties
 
 
 [2]
 In re Briggs Transportation Company, 780 F.2d 1339 (8th Cir.1985); Grundy National Bank v. Tandem Mining Corp., 759 F.2d 1436 (4th Cir.1985); In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984)
 
 
 [3]
 The majority erroneously limit the scope of Secs. 361(1) and (2) to declines in the value of the collateral due to its use, sale or lease. The subsections also protect against declines caused by the stay itself. The most pervasive damage caused by the stay, as will be seen, is the cost of delay
 
 
 [4]
 Protection of the collateral may be all a secured creditor is entitled to receive from a constitutional standpoint. See Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); Comment, Compensation of Adequate Protection During the Automatic Stay in Bankruptcy, 50 U.Chi.L.Rev. 305, 310 (1983)
 
 
 [5]
 Paradoxically, this conclusion means that Sec. 361 of the Bankruptcy Code, which was intended to protect the secured creditor, instead coerces him by allowing the clock to run against his uncompensated opportunity cost
 
 
 [6]
 It is necessary to discuss the Family Farmer Act because the majority dwelt on its significance at length in their supplemental opinion. Our purpose is to show that signals emanating from the Family Farmer Act, although problematic, reflect in favor of the position espoused by this dissent." ... [W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one ..., such views are entitled to significant weight ... and particularly so when the intent of the enacting Congress is obscure." Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980)
 
 
 [7]
 The majority would limit the significance of this bill where it conflicts with their position by contending that Congress addressed only a limited problem--relief for bankrupt farmers--and for this reason did not do away with American Mariner wholesale. It is worthwhile to point out, however, that Congress, as part of the Family Farmer Act, also amended the Bankruptcy Code to prevent discharge of administrative support judgments and remedy a problem existing in general bankruptcy law. 11 U.S.C. Sec. 523(a)(5), amended by P.L. 99-554 Sec. 281. Congressional vision thus extended beyond the plight of farmers, but did not reach out to repeal American Mariner
 
 
 [8]
 That Congress, while enacting special treatment in bankruptcy for farmers, inferentially approved the American Mariner concept of adequate protection for other debtors is supported by legislators' comments at the passage of the Family Farmer Act. Cong.Rec. 15074-15092, Oct. 3, 1986. Senator DeConcini referred to "revision of long held doctrines of the bankruptcy code such as ... adequate protection." Id. at 15092. Concern was expressed by Senators Thurmond and DeConcini that Congress may have tilted too far from prior concepts of adequate protection and the absolute priority rule in its efforts to assist farmers. Senator DeConcini questioned whether the farm credit system could stand the massive write-downs of debt portended by this "extraordinary," "experimental" legislation. The temporary nature of the program (seven years) was emphasized. This Court does not enjoy the luxury of devising a temporary exception to its construction of the adequate protection provision in Sec. 361
 
 
 [9]
 The majority suggest that "logical inconsistencies have erupted in lower court decisions" concerning the timing and interest rate applicable to American Mariner payments, as an argument against the validity of the decision. Section 361's adequate protection requirements across the board have been the most heavily litigated section of the Bankruptcy Code. That stems from their generality, from their being based on difficult and easily variable valuations of property, and from their overriding importance to the protection of secured creditors. The valuation of lost opportunity cost is a fact-specific finding, dependent upon the valuation of collateral in issue, assessing the consequences under state law if the lender were to institute foreclosure, and the applicable interest rate. See also Fortgang & Mayer, 1986 Interest & Costs for the Secured Creditor in Bankruptcy, article presented at 1986 NYU Bankruptcy Law Seminar
 
 
 [10]
 The majority argue at length that adequate protection cannot include payments for lost opportunity cost because that principle leads to "logical inconsistencies" connected with the confirmation of plans of reorganization. The existence of such inconsistencies was noted by Fortgang & Mayer, Valuation in Bankruptcy, supra, cited by the majority. Fortgang & Mayer have subsequently commented on this citation as follows: "Like the authors, whose analysis she cited, Judge Randall found difficulty in reconciling American Mariner interest with various sections of the Code.... Unlike the authors, whose contrary conclusion she did not cite, Judge Randall found such difficulty reason to reject American Mariner." Fortgang & Mayer, 1986 Interest and Costs for the Secured Creditor in Bankruptcy, paper prepared for NYU bankruptcy law seminar. In any event, the reconciling of American Mariner payments with confirmation provisions of the Code is a highly speculative, hypothetical, and complex enterprise, which is not presented by the facts of this case and should not be here decided. Messrs. Fortgang and Mayer have admirably explored the necessary reconciliations in their two articles
 
 
 [11]
 As the Family Farmer Act in part demonstrates, not every single-asset bankruptcy case is filed in bad faith. Timbers, however, shares a predicament with many single-asset cases which may be vulnerable to dismissal or lifting the automatic stay on the ground that bankruptcy was filed in bad faith. See In Re: Little Creek Development, 779 F.2d 1068 (5th Cir.1986)